## DECLARATION

This declaration is submitted in support of a complaint for forfeiture of: (1) $2,200,000 in United States Currency seized from Wells Fargo bank account #XXXXXXX3269 on July 25, 2012 on (2) 20 checks and 14 money orders seized from 27324 Camino Capistrano, Laguna Niguel, CA, listed in Attachment A on July 25, 2012; (3) 51 checks and 14 money orders seized from 33762 Avenida Calita, San Juan Capistrano, CA on July 25, 2012 listed in Attachment B; and (4) 31 checks and 6 money orders seized on July 27, 2012 and August 1, 2012 from Federal Express packages addressed to Daniel BOWLES and M&C Wholesale listed in Attachment C (together the "Defendant Property");

I, Thomas Adams, Special Agent of the Drug Enforcement Administration, submit that there are sufficient facts to support a reasonable belief that the Defendant Property constitutes (1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and (3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

As described in more detail below, the Defendant Property was involved in the distribution of controlled dangerous substance analogues by Daniel BOWLES and M&C Wholesale. BOWLES and M&C Wholesale conducted an operation whereby they would manufacture controlled dangerous substance analogues in California and sell the products to retail "smoke shops" throughout the country. BOWLES and M&C Wholesale would ship the products to those retail stores by mail and Federal Express, and the stores would pay for the products by sending BOWLES and M&C Wholesale checks or money orders by mail or Federal

1

Express. The Defendant Property consists of funds seized from a bank account that was used a repository for those payments, and checks and money orders constituting the payments themselves.

## AGENT BACKGROUND

1.    I, Thomas Adams, have been a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") since November 2002. I am currently assigned to the Washington Field Division, Baltimore District Office, and investigate violations and violators of Title 21 of United States Code primarily within the District of Maryland.

2.    I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3.    I have received specialized training and participated in investigations relating to the possession, manufacture, distribution, importation of illegal drugs, as well as methods used to conceal and finance illegal drug transactions and drug diversion.

4.    I have arrested and/or participated in the arrest of numerous persons for violations of Federal and State narcotics statutes. I have authorized and/or participated in the execution of numerous search and seizure warrants that have targeted violations and violators of the Federal and State criminal narcotics statutes. I have participated in all aspects of narcotics investigations, including physical surveillance, execution of search warrants, undercover transactions, court ordered wiretap monitoring, analysis of phone and financial records, and arrests of numerous drug traffickers. I have debriefed numerous defendants, confidential informants, and other witnesses having extensive knowledge of the inner workings of major narcotics trafficking

2

organizations. I have also spoken on numerous occasions with other experienced narcotics

investigators concerning the methods and practices of drug traffickers and money launderers.

Through these investigations, my training and experience, and conversations with other law

enforcement personnel, I have become familiar with the methods used by drug traffickers to

manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-

derived proceeds. I am further aware of the methods employed by major narcotics organizations

to thwart any investigation of their illegal activities.

**Applicable Statutes**

5.      Title 21 U.S.C. section 802 (32)(A) states:

The term "controlled substance analogue" means "a substance –

(i) the chemical structure of which is substantially similar to the chemical
structure of a controlled substance in schedule I or II; [and either]

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central
nervous system that is substantially similar to or greater than the stimulant,
depressant, or hallucinogenic effect on the central nervous system of a controlled
substance in schedule I or II; or
(iii) with respect to a particular person, which such person represents or intends to
have a stimulant, depressant, or hallucinogenic effect on the central nervous
system that is substantially similar to or greater than the stimulant, depressant, or
hallucinogenic effect on the central nervous system of a controlled substance in
schedule I or II.

*See United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (to establish that a substance is an

analogue, government must prove a chemical similarity to a controlled dangerous substance and

either a similar effect as a controlled dangerous substance or that the defendant represented the

substance to have similar effects as a controlled dangerous substance).

6.      Title 21 U.S.C. section 813 states:

A controlled substance analogue shall, to the extent intended for human
consumption, be treated, for the purposes of any Federal law as a controlled
substance in Schedule I.

3

7.      Congress passed a law making JWH-018 a schedule I controlled dangerous substance on March 1, 2011. *See* 21 C.F.R. § 1308.11(g)(8).

8.      Analysis conducted by DEA on analogues such as UR-144 and XLR11 has concluded that these analogues are substantially similar in chemical structure and have similar pharmacological effects on the central nervous system to those of the Schedule I banned substance JWH-018. *See*

*http://www.deadiversion.usdoj.gov/drug_chem_info/spice/spice_ur144_xlr11.pdf*.

9.      Congress passed a law making 1-(Fluoropenty1)-3-(1-naphthoy1) indole (AM2201) a schedule I controlled dangerous substance on July 7, 2012. *See* S. 3187, 112th Cong. (2012) (enacted July 7, 2012); 21 C.F.R. § 1308.11(g)(11).

**Undercover Purchases**

10.     The Tobacco Stop, located at 5 Bel Air South Parkway, Suite 1627, Bel Air (Harford County), Maryland, is a retail business which has in the past sold tobacco and related supplies, as well as an illegal controlled substance analogue known as "Hysteria," which has effects similar to marijuana.

11.     In September 2011, a credible and reliable source of information (SOI) informed DEA Tactical Diversion Squad Group 59 that The Tobacco Stop was selling a synthetic drug packaged under the name "Hysteria," which by its packaging purported to be "potpourri."

12.     Abusers of "Hysteria" have reported a similar and/or greater effect than marijuana, which is a Schedule I controlled dangerous substance.

13.     On September 22, 2011, a DEA undercover officer ("UC") entered the store and asked the individual working behind the counter, who was later identified as Dev Bahadur HAMAL whether there was any "Hysteria" for sale. HAMAL nodded in the affirmative, and then reached

under the counter near the cash register, and offered the UC a black zip-lock bag labeled, "1 gm HYSTERIA potpourri, 100% Marshmallow leaf not for human consumption."

14.     HAMAL told the UC that 1 gram of Hysteria cost $20.

15.     The UC paid and received the "Hysteria" and then asked HAMAL if "you smoked this stuff." HAMAL replied in the affirmative, and explained to the UC that "Hysteria," was designed to be smoked, despite instructions on the package that Hysteria was "not for human consumption."

16.     Certified forensic chemists at the DEA Mid-Atlantic Laboratory chemically analyzed the "Hysteria" and concluded that the active ingredient in it was 1-(Fluoropentyl)-3-(1-naphthoyl) indole (AM2201) (hereafter referred to as "AM2201" or "Hysteria"), which is an analogue of 1-pentyl-3-(1-naphthoyl) indole (JWH-018), which is a Schedule I Controlled Dangerous Substance (hereafter referred to as "JWH-018").

17.     On November 14, 2011, the same UC purchased a 3-gram packet of "Hysteria" for $47.00 from HAMAL.

18.     The UC then explained to HAMAL that after smoking the "Hysteria," the UC's pipe was not functioning properly. HAMAL recommended rolling papers to the UC, and based on HAMAL's recommendation, the UC purchased a packet of E-Z Wide brand slow-burning rolling papers from HAMAL at The Tobacco Stop.

19.     Rolling papers are commonly used to roll marijuana-type substances into cigarette form for consumption.

20.     HAMAL warned the UC to be careful using the rolling papers because "Hysteria" is, "very strong."

21. As stated above, AM2201 was made a schedule I controlled dangerous substance on July 7, 2012.

22. AM2201 is also an analogue of JWH-018, which has been a schedule I controlled dangerous substance since March 1, 2011. Under the statutes governing controlled substance analogues described above, in order for AM2201/Hysteria to be considered an "analogue," and therefore treated as a Schedule I controlled substance, it must meet the two requirements of 21 U.S.C. §802(32)(A), and be intended for human consumption pursuant to 21 U.S.C. §813. As set forth more fully below, your declarant believes that AM2201/Hysteria meets these criteria. With respect to the first requirement of 21 U.S.C. § 802(32)(A)(i), i.e., that the chemical structure be substantially similar to the chemical structure of a Schedule I or II controlled substance, according to the certified chemists of DEA's Mid-Atlantic Laboratory, (1) 1-(5-Fluoropentyl)-3-(1-naphthoyl) indole, (the chemical make-up of AM2201/Hysteria), shares substantial chemical structural similarities with the Schedule I substance, 1-pentyl-3-(1-naphthoyl) indole (the chemical make-up of JWH-018, a Schedule I controlled substance).

23. With respect to the second requirement of 21 U.S.C. § 802(32)(A)(ii), according to DEA forensic chemists the pharmacological effect of AM2201/Hysteria is likely to be the same as the effect of the synthetic cannabinoid JWH-018, a Schedule I controlled substance

24. Under 21 U.S.C. § 813, the government is also required to show that the analogue substance was intended for human consumption. Your declarant knows from his training and experience that synthetic and analogue substances are frequently packaged with labeling indicating "not for human consumption" in an attempt to protect the manufacturers from prosecution. The AM2201/Hysteria purchased from The Tobacco Stop in the present case is so

labeled.  However, as described in ¶¶ 15 and 18 above, HAMAL clearly indicated to the UC that the product was intended to be smoked.

### December 14, 2011 Search Warrant

25.    On December 14, 2011, members of the DEA Tactical Diversion Group and the Harford County (Maryland) Sheriff's Office entered the Tobacco Stop, and executed a search warrant issued by a judge of the State of Maryland's District Court.  Law enforcement seized from the location approximately 400 packages labeled "Hysteria," approximately 30 packages labeled "Game Over," and approximately 17 packages labeled "Black Sabbath," as well as other similar products.

26.    Also found during the search warrant were sale invoices from Daniel BOWLES reflecting the shipment of "Hysteria," "Game Over," and "Black Sabbath" from BOWLES to The Tobacco Stop.

27.    Chemical analysis of the seized packages labeled "Hysteria," "Game Over," and "Black Sabbath" by chemists at the DEA Mid-Atlantic Laboratory revealed that those items contained AM2201, which as outlined above is an analogue of JWH-018, a Schedule I controlled substance.

### April 3, 2012 Controlled Phone Call to Dan BOWLES

28.    On April 3, 2012, DEA Task Force Officer ("TFO") Dave Metzler, TFO Glenn Hester and SA James Weekes met with a confidential source ("CS"), who placed a telephone call to (949) 400-2975, which was found on the invoices from Dan BOWLES found at The Tobacco Stop described above. A man answered the phone and identified himself as "Dan."  During the course of that call, this individual agreed to send a sample package of his products.

29.     The individual told the CS that he currently carries "Brain Freeze," "Black Sabbath," "Game Over," and "Dr. Feelgood," and further indicated that he did not sell "Hysteria" anymore and that "Brain Freeze" was his best seller.

30.     The CS then ordered an amount of that substance, and directed that delivery was to be made to a retail business named the Dragon's Den Smoke House, located at 1730 Fleet Street in Baltimore, Maryland.

### April 4, 2012 Seizure

31.     On April 4, 2012, Christina Scott, an employee of the Dragon's Den Smoke House provided TFO Metzler and me a Federal Express envelope that had arrived at the Dragon's Den Smoke House. The Federal Express envelope contained sixteen individual items variously packaged as "Dr. Feelgood," "Game Over XXX," "Brain Freeze," and "Black Sabbath."

32.     The Federal Express envelope also contained a cover letter and an invoice/price sheet from M&C Wholesale.

### April 5, 2012 Seizure

33.     On April 5, 2012, Chrisina Scott provided federal agents a Federal Express parcel containing twenty individual items variously packaged as "Dr. Feelgood," "Game Over XXX," "Brain Freeze," and "Black Sabbath."

34.     The Federal Express package also contained one invoice/price sheet on M&C Wholesale letterhead having a contact phone number (949) 400-2975.

35.     According to AT&T records, this phone number is subscribed to by Ratchanee MCAULEY. This phone number is also the same number that the CS dialed and spoke to a person who identified himself as "Dan" on April 3, 2012, described above in ¶ 28.

36.     This Federal Express package was addressed from Daniel BOWLES, M&C Wholesale, 27324 Camino Capistrano, Suite 155, Laguna Niguel, CA 92677, phone number, (949) 400-2975.

### Analysis of Spice Products Seized on April 4 and 5, 2012

37.     DEA Chemists analyzed the items contained in the Federal Express envelopes that were sent to the Dragon's Den Smoke House and seized on April 4 and 5 and concluded that these items contained UR-144, an analogue of the Schedule I Controlled Dangerous Substance JWH-018.

### Controlled Purchase from Daniel Bowles on June 18, 2012

38.     On June 18, 2012, while under law enforcement direction and supervision, the CS placed a phone call (which was recorded with his/her consent) to telephone number 949-400-2975. During the ensuing conversation, the CS indicated that he/she wished to purchase an additional quantity of a "Spice," primarily the product known as "Brain Freeze."

39.     The male who answered the CS's phone call, answered to the name "Dan." Accordingly, I have concluded that this individual was Daniel BOWLES.

40.     The CS advised BOWLES that he/she wanted 50 packages of "Brain Freeze," and wanted a two-day delivery shipping option.

41.     On at least three occasions during this call, the CS inquired about what product they had for sale was the strongest when smoking. BOWLES explained only one time that his products are not meant for smoking.

42.     However, BOWLES then explained to the CS what products his customers prefer. For example, BOWLES explained that his customers liked "Feel Good" better than "Game Over," and that "Brain Freeze" is also one of his popular brands.

43.     Never during this conversation did BOWLES explain to the CS that his products are to be used as potpourri, which according to their label is their purported use. On June 20, 2012, your declarant observed a Federal Express truck deliver a package to 1730 Fleet Street, Baltimore, Maryland 21231, the business address of as the Dragon's Den Smoke House, the location to which the CS's purchase from BOWLES was to be shipped.

44.     The Federal Express package contained numerous packets containing plant matter. 50 of the packets were labeled "Brain Freeze," 10 of the packets were labeled "Mary Jane," 5 of the packets were labeled "Hysteria Black," 5 of the packets were labeled "Black Sabbath," 5 of the packets were labeled "Game Over," 5 of the packets were labeled "Dr. Feel Good," 5 of the packets were labeled "Shock Wave," and 5 of the packets were labeled "Miami Spice."

45.     The shipping label on the package indicated that it had been shipped from International Wholesale, 27324 Camino Capistrano Suite, 155, Laguna, Niguel, CA 92677; the same address used by M&C Wholesale.

46.     In June 2012, DEA's Mid-Atlantic Lab analyzed the product labeled "Brain Freeze" and determined that it contained the chemicals UR-144 and MAM-2201, both analogues of JWH-018, a Schedule I controlled substance.

### July 25, 2012 Search and Seizure Warrant

47.     An employee of a courier service has explained to law enforcement that he/she has made multiple deliveries of items to M&C Wholesale and has also picked up items for shipment from M&C Wholesale.

48.     He/she stated to law enforcement that originally M&C Wholesale was located only in Suite 155 of 27234 Camino Capistrano, but later expanded into Suites 156 and 172.

49.     According to this courier service employee, during his/her performance of duties associated with the courier service, he/she has within the past month been physically inside Suite 156 of 27234 Camino Capistrano and has observed 8-10 individuals seated around a table handling piles of a green herb-like substance. No other activity appeared to be ongoing within the suite.

50.     According to the courier service employee, he/she had asked "Mike," who appeared to be an employee of M&C Wholesale, what the nature of their business was, and "Mike" responded that they sell items wholesale to "smoke shops."

51.     The analogue products sold by M&C Wholesale as described above typically use vegetable or herb substances as a base with which an analogue substance is then combined. Once combined, the analogue and herb/vegetable substances are then typically packaged in small heat-sealed bags for retail sale, and once purchased from a "smoke shop" the contents are then smoked.

52.     On July 25, 2012 three federal search and seizure warrants issued by Judge Robert Block of the United States District Court for the Central District in California were executed at 27324 Camino Capistrano, Laguna Niguel, CA 92677, suites 155, 156, and 172.

53.     Several thousand pounds of suspected analogue product "Spice" along with several kilograms of the suspected pure chemicals that make up the suspected analogue products were seized during the execution of the warrant.

54.     Also seized were several thousand pre-packaged bags of suspected analogue with various brand names that included Brain Freeze, Dr. Feelgood, Black Sabbath, Game Over, and Hysteria which were located throughout the above mentioned suites.

55.     Among the pre-packaged materials were a number labeled "Brain Freeze." This is the brand of "Spice" that was purchased during the controlled calls initiated by the CS on April 3, 2012 and June 18, 2012.

56.     DEA's Mid-Atlantic Laboratory analyzed the substance in the packages labeled "Brain Freeze" and determined that the substance contained the chemicals UR-144 and MAM-2201. Both of these products are analogues of JWH-018, a Schedule I controlled substance.

57.     Additionally, 20 checks and 14 money orders payable to Daniel BOWLES or M&C Wholesale listed in Attachment A were seized from 27324 Camino Capistrano, Laguna Niguel, CA.

**July 25, 2012 Consent to Search at 33762 Avenida Calita, San Juan Capistrano**

58.     On July 25, 2012 Daniel BOWLES was interviewed and gave law enforcement consent to search his residence located at 33762 Avenida Caltita, San Juan Capistrano Orange, California 92675.

59.     When approaching that residence to conduct the consent search, federal agents encountered Ratchanee MCAULEY at the residence. MCAULEY was carrying multiple empty packages of "Kratom XXX" with her. MCAULEY was cooperative and invited the Police Detectives inside her residence. MCAULEY said she lived with her boyfriend, Dan BOWLES.

60.     Later that day, having received verbal consent from MCAULY, federal agents searched MCAULEY's residence.

61.     Agents found a stack Federal Express envelopes on the kitchen counter. MCAULEY opened each Federal Express envelope upon the request of the agents, and the envelopes contained various payments in the form of checks and money orders, listed in Attachment B, payable to M&C Wholesale or Dan BOWLES.

62.    The agents also seized additional articles of indicia/documents/spice from the southeast corner of the kitchen.

### Seizure of Additional Checks and Money Orders Destined For M&C Wholesale

63.    On July 27, 2012 and August 1, 2012 law enforcement officers identified Federal Express packages addressed to M&C Wholesale at 27324 Camino Capistrano, Laguna Niguel, CA 92677.

64.    Based on information obtained from the July 25, 2012 search warrant, Homeland Security Investigation Special Agent Tamara Sopka obtained a Federal Search warrant to open the packages.

65.    The packages contained spice products and additional checks/money orders payable to Daniel Bowles or M&C Wholesale, listed in Attachment C.

### Knowledge of M&C Wholesale and Dan BOWLES

66.    I know based on my training, knowledge, and experience that a legitimate manufacturer of "potpourri" would have no reason to add a chemical such as AM-2201, UR-144, MAM-2201, or XLR-11 to the product.  Even if there were such a reason, there is no legitimate reason to *change* from one chemical to another.

67.    Based on my training, knowledge, and experience I know that the only reason to add chemical such as AM-2201, UR-144, MAM-2201, or XLR-11 to a "potpourri" product is to give it the properties of a controlled substance analogue.  And the only reason to change from one chemical to another is to avoid new legislation or other government action against existing analogue substances.

68.     On the day search warrant, law enforcement officers provided Dan BOWLES his

*Miranda* rights and he consented to be interviewed.  Bowles stated that M&C Wholesale's

products contained UR-144, referring to the substance by that name.

69.     On February 21, 2013, law enforcement interviewed another confidential source (CS-2).

CS-2 said that he/she had overheard conversions in which BOWLES, other employees of M&C

Wholesale, and other individuals discussed the fact that M&C Wholesale's products were

smoked.  These individuals further discussed the chemical effects that the products had on the

body and that they made users "high."

70.     CS-2 further told law enforcement that M&C Wholesale provided its customers lab

reports along with its products.  The lab reports explained which substances the products did not

contain, but did not include the substances the products did contain.  Effectively, M&C

Wholesale explained in these reports that their products did not contain certain controlled

substances and controlled substance analogues while concealing that the products in fact

contained other controlled substance analogues.

71.     CS-2 explained that these lab reports contained analyses of samples that were less potent

than the product that M&C Wholesale sent to their customers.

72.     On February 28, 2013 law enforcement interviewed Frank Gonzalez, an employee of

M&C Wholesale who marketed that company's products.  Gonzales stated that Dan BOWLES

told him not to use the word "smoke" and to use the word "aroma" not "flavor" when referring to

M&C Wholesale's products.

73.     Gonzales further stated that when his customers told him that a particular chemical in

M&C Wholesale's product was banned, Gonzalez would provide that information to Bowles.

Bowles would then tell Gonzalez that the chemical would be changed.

14

74.     Based on the above, I conclude that Dan BOWLES and others at M&C Wholesale knew that the AM-2201, UR-144, MAM-2201, or XLR-11 products they were selling (i) had a substantially similar to the chemical structure of a controlled substance in schedule I or II; [and either]; (ii) had a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (iii) were represented or intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

75.     Based on the above, I further conclude that Dan BOWLES and others at M&C Wholesale sold their products, which contained AM-2201, UR-144, MAM-2201, or XLR-11, intending them to be used for human consumption.

### Use of Wells Fargo Bank account XXXXXX0553 as a Repository of Illegal Proceeds

76.     During interviews by federal agents, employees of The Tobacco Stop explained that they paid M&C Wholesale by check whenever an order of controlled substance analogues was delivered.

77.     According to subpoenaed bank records, from November, 2010 and December, 2011, various checks from The Tobacco Stop worth $66,117.50 made payable to M&C Wholesale and/or Daniel Bowles were deposited in Wells Fargo Bank account XXXXXX0553.

78.     According to the records of Wells Fargo Bank, account number XXXXXX0553 was opened in the name M&C Wholesale, and Daniel BOWLES and Chelsea Bowles (sister in-law) are two signators for the account.

79.    The records revealed that on July 16, 2011, there was in aggregate $324,522.00 deposited into that account for a single day.

80.    According to Wells Fargo Bank records, most of the deposits came from business establishments with names like "D & A Smoke Shop," "Puff N Snuff," "Hawaiian Holy Smoke," "190 Drive-Thru Smoke Shop," "North Shore Smoke Shop," "Happy Daze," "Up in Smoke," and "Sky High Smoking Accessories."

81.    These same businesses sent the checks and money orders listed in Attachments A, B, and C.

82.    These businesses are similar in nature to The Tobacco Stop and Dragon's Den. Each of those businesses either: 1) had a name implying they were in the "smoke shop" business or 2) or, such as in the case the businesses named "The Cupboard," "The Other Place," and "S and K Express," information from internet and law enforcement database searches confirmed that those business were "smoke shops."

83.    As laid out above, the method of operation that M&C Wholesale used to distribute controlled substance analogues is as follows:

- Orders were placed with sales personnel of M&C Wholesale.

- M&C Wholesale then filled the orders with Cash on Delivery shipments to individuals and stores throughout the United States via Federal Express.

- After delivery of the shipment, the purchaser paid for the order by sending a bank check or money order payable to M&C Wholesale or Dan BOWLES to M&C Wholesale at 27324 Camino Capistrano Laguna Niguel, CA 92677.

84.    On July 26, 2012, pursuant to a seizure warrant issued by the District of Maryland based on a finding of probable cause to believe that the funds in Wells Fargo bank account #

XXXXXXX3269 were the proceeds of illegal narcotics distribution in violation of 21 U.S.C. §§ 802(32) and 846, the government seized $2,200,000.00 from that Wells Fargo bank account.

85.     The facts above demonstrate that the Wells Fargo bank account # XXXXXXX3269 was a repository for money paid to purchase illegal narcotics sold by Daniel BOWLES and M&C Wholesale.

86.     Furthermore, the facts above demonstrate that the checks and money orders listed in Attachments A, B, and C were intended to be used to purchase illegal narcotics from Daniel BOWLES and M&C Wholesale and represent proceeds from those sales.

**Conclusion**

87.     Accordingly, there is a reasonable belief that the (a) $2,200,000 in United States Currency seized from Wells Fargo bank account #XXXXXXX3269 on July 25, 2012; (b) 20 checks and 14 money orders seized from 27324 Camino Capistrano, Laguna Niguel, CA, listed in Attachment A on July 25, 2012; (c) 51 checks and 14 money orders seized from 33762 Avenida Calita, San Juan Capistrano, CA on July 25, 2012 listed in Attachment B; and (d) 31 checks and 6 money orders seized on July 27, 2012 and August 1, 2012 from Federal Express packages addressed to Daniel BOWLES and M&C Wholesale listed in Attachment C constitute (1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and (3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO TITLE 28 U.S.C. 1746
THAT THE FACTS LAID OUT ABOVE ARE ACCURATE, TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Special Agent Thomas Adams
Drug Enforcement Administration

ATTACHMENT A

From 27324 Camino Capistrano, Laguna Niguel, CA

| | |
|---|---|
| Bank of America Check #106 | $41,767.00 |
| Extraco Banks Check #1090 | $540.00 |
| BancFirst Check #3053 | $3,487.50 |
| Bank of America Check #11553 | $2,858.00 |
| Wells Fargo Check #10133 | $6,150.00 |
| JP Morgan Chase Bank #5056 | $5,475.00 |
| Peoples Bank Check #02615 | $690.00 |
| US Bank Check #610 | $6,000.00 |
| National Bank Check #1351 | $7,525.00 |
| Liberty Bank Check #18893 | $940.00 |
| SunTrust Bank Check #1194 | $5,345.00 |
| First National Bank Check #1063 | $3,180.00 |
| Metz Banking Company Check #11024 | $21,225.00 |
| Communities of Abilene Federal Credit Union Check #1641 | $14,047.50 |
| Sovereign Bank Check #3482 | $470.00 |
| Wells Fargo Bank Check #1759 | $2,138.75 |
| PNC Bank Check #1429 | $4,378.75 |
| JP Morgan Chase Bank Check #5162 | $2,500.00 |
| Bank of America Check #1881 | $1,500.00 |
| Bank of Travelers Rest Check #1117 | $1,885.00 |
| (10) Money Gram Money Orders | $6,369.50 |
| (4) Western Union Money Orders | $3,500.00 |

ATTACHMENT B

From 33762 Avenida Calita, San Juan Capistrano, CA

| | |
|---|---|
| BB&T Bank Check #1041 | $620.00 |
| BB&T Bank Check #1040 | $2,100.00 |
| Metz Banking Company Check #10175 | $2,232.50 |
| Bank of America Check #430 | $735.00 |
| Communities of Abilene Federal Credit Union Check #1634 | $4,975.00 |
| Wells Fargo Bank Check #10106 | $5,200.00 |
| US Bank Check #609 | $3,000.00 |
| Central Bank of Lake of the Ozarks Check #2089 | $20,605.00 |
| Banner Bank Check #31920 | $1,200.00 |
| SunTrust Bank Check #1192 | $7,112.50 |
| PNC Bank Check #1423 | $2,880.00 |
| Bank of America Cashier's Check #5602140 | $15,145.00 |
| Pacific International Bank Check #3481 | $500.00 |
| Banner Bank Check #3991 | $325.00 |
| Wells Fargo Bank Money Order #0515614820 | $200.00 |
| Wells Fargo Bank Money Order #0515614819 | $1,000.00 |
| Fifth Third Bank Check #9304 | $500.00 |
| Fifth Third Bank Check #9302 | $500.00 |
| Fifth Third Bank Check #9303 | $500.00 |
| Fifth Third Bank Check #9305 | $500.00 |
| Fifth Third Bank Check #9306 | $500.00 |
| Fifth Third Bank Check #9307 | $500.00 |
| Fifth Third Bank Check #9309 | $500.00 |
| Fifth Third Bank Check #9308 | $500.00 |
| Fifth Third Bank Check #9310 | $500.00 |
| Fifth Third Bank Check #9311 | $500.00 |

| | |
|---|---|
| Fifth Third Bank Check #9312 | $500.00 |
| Fifth Third Bank Check #9313 | $500.00 |
| Wells Fargo Bank Check #1756 | $1,651.25 |
| Stock Yards Bank & Trust Check #1042 | $500.00 |
| Extraco Banks Check #1085 | $700.00 |
| Bank of America Check #1042 | $2,920.00 |
| Bank of America Check #4412 | $12,200.00 |
| M&T Bank Check #1157 | $881.25 |
| Bank of Hawaii Check #1653 | $2,000.00 |
| First Citizens Bank Check #1090 | $620.00 |
| First Bank &Trust Check #2980 | $3,750.00 |
| PNC Bank Check #3259 | $8,950.00 |
| Fifth Third Bank Check #9285 | $500.00 |
| Fifth Third Bank Check #9286 | $500.00 |
| Fifth Third Bank Check #9387 | $500.00 |
| Fifth Third Bank Check #9388 | $500.00 |
| Fifth Third Bank Check #9390 | $500.00 |
| Fifth Third Bank Check #9389 | $500.00 |
| Fifth Third Bank Check #9391 | $500.00 |
| Fifth Third Bank Check #9392 | $500.00 |
| Huntington Bank Check #154 | $2,540.00 |
| Community National Bank Check #3449 | $10,645.00 |
| US Bank Check #9493 | $2,431.00 |
| Bank of America Check #2787 | $3,195.00 |
| Bank of America Check #355 | $3,571.50 |
| (13) Money Gram Money Orders | $7,050.00 |
| (1) Merchants Express Money Order | $712.00 |

ATTACHMENT C

From HSI Orange County

| | |
|---|---|
| US Bank Check #1944 | $4,000.00 |
| Comerica Bank Check #1605 | $825.75 |
| Wells Fargo Bank Check #173 | $1,035.50 |
| US Bank Check #9499 | $1,952.50 |
| American Savings Bank Check #1089 | $1,962.50 |
| PNC Bank Bank Check #1028 | $1,050.00 |
| Alaska USA Federal Credit Union Check #0000700643 | $3,822.50 |
| Bank of America Check #438 | $1,000.00 |
| Wells Fargo Bank Check #2441 | $895.00 |
| JP Morgan Chase Bank Check #3448 | $787.50 |
| Banner Bank Check #10705 | $1,152.00 |
| First Bank & Trust Check #2983 | $3,850.00 |
| Bank of America Check #1232 | $3,625.00 |
| JP Morgan Chase Bank Check #1930 | $2,262.50 |
| Community National Bank Check #3461 | $6,145.00 |
| Citizens Bank & Trust Check #1431 | $352.50 |
| JP Morgan Chase Bank Check #1927 | $1,927.00 |
| Ulster Savings Bank Check #1151 | $1,184.00 |
| The Conway National Bank Check #10338 | $2,300.25 |
| Central Bank of Lake of the Ozarks Check #2113 | $22,960.00 |
| Cashmere Valley Bank Check #8498 | $2,050.00 |
| American Saving Bank Check #1349 | $1,500.00 |
| Bank of Hawaii Check #9419876 | $4,280.00 |
| JP Morgan Chase Bank Check #1043 | $540.00 |
| American Savings Bank Check #5433 | $3,000.00 |

| | |
|---|---|
| Citizens Bank Check #1486 | $2,020.00 |
| US Bank Check #1339 | $1,120.00 |
| Citizens Bank Check #7534 | $2,620.00 |
| Bank of America Check #2715 | $1,025.00 |
| Wells Fargo Bank Check #3540 | $570.00 |
| Wells Fargo Cashier's Check #0777300275 | $1,900.00 |
| (1) USPS Money Order | $370.00 |
| (3) Money Gram Money Orders | $1,100.00 |
| (2) Western Union Money Orders | $912.00 |
| | --------------- |
| TOTAL | $370,215.50 |