EXHIBIT C

# DECLARATION OF JOSEPH P. BONO

**REPORT OF EVALUATION**                                                          July 12, 2013

**INTRODUCTION**

I have been retained by Mr. James Felman to evaluate the scientific relationship of four substances which were not controlled under Part 1308 of the Code of Federal Regulations, by the PUBLIC LAW 112–144—JULY 9, 2012 126 STAT. 993, or by the Emergency Scheduling Authority of the Administrator of the Drug Enforcement Administration (DEA) prior to July 2012. The government is using the Controlled Substances Analogue and Enforcement Act of 1986 (CSAEA) [14. 21 U.S.C. §§ 802, 813] to categorize the status of purported "cannabimetric" compounds as controlled substances. I have included molecular structure diagrams in this report to illustrate the "line and letter" stick drawings which are typically used in discussions to depict "molecular structures." They are included here for illustration purposes with the acknowledgement and understanding that they are gross oversimplifications of reality. There is no scientific justification for using two dimensional line and letter representations in the attempt to present "best evidence" when evaluating chemical structures. Line and letter drawings are misleading and insufficient in the guilt/innocence phase of a trial to justify molecular structure representations of "similarity" related to how these substances really exist in three dimensional space. There are significant differences in evaluating the structures of purported controlled substance analogues with the actual three dimensional representations of the controlled substance to which these so-called analogues are compared. In forensic science reporting, unless accompanied by supporting data and explanations, all differences are significant and should be viewed with skepticism when arguing "structural similarity."

**THE SUBSTANCES NAMED IN THE CASE AT HAND**

The four substances named in the "case at hand" are delineated with the following terminology: **AM-2201, UR-144, XLR-11** and **MAM-2201**. It is important to note that the complaint does not list any of these substances by using accepted chemical nomenclature. The government also claims in its complaint that:

> *"M&C Wholesalers knew that these compounds they were selling had a chemical structure substantially similar to the chemical structure of a controlled substance in schedule I or II."*

I question whether the government representative who filed the complaint, then or now had/has any awareness of the chemical structures of these four compounds from the alpha-numeric designations above. Keep in mind that these chemical names have their sources in the researcher

who synthesized the substance and not in an accepted system which defines chemical nomenclature.

Without reliable literature references including, but not limited to that provided by the Drug Enforcement Administration (DEA), the corresponding chemical structures could not be determined individually for any of these substances. It is also important to recognize that whenever the substances referenced above are mentioned in either official DEA documentation, or when mentioned in legislation, recognized chemical nomenclatures which describe chemical formulation are also included.

### THE CHEMISTRY OF THE CASE AT HAND

Each of the substances named below having its source in the complaint will include the following:

1. Accepted chemical nomenclature which describes the molecule based on its chemical structure
2. The molecular formula delineating the number of atoms in each molecule
3. A listing of the 10 highest abundance peaks in the mass spectral chart for each molecule.
    a. In the charts below, the red number is the base peak, which in some instances is the molecular ion, and the black numbers designate the relative abundance of that peak in comparison to the other peaks depicted in the chart.
4. A complete mass spectra chart (MSC) for each molecule
5. For the purposes of illustration, embedded in each MSC is a two dimensional line and letter drawing for each molecule. It is important to note that the MSC for each substance has its source in a computer program available in the public domain through the National Institute of Standards and Technology (NIST). However, these line and letter drawings are included as a quick shorthand notation and are lacking in detail which truly represents the chemical structure of each molecule. These two dimensional representations do not show all of the atoms in the molecule, nor do they accurately depict the bonding (atom to atom) within the molecule bonding. No attempt is made to represent bond lengths and bond angles in line and letter drawings.
6. Three dimensional molecular representations more accurately depict in two dimensions on paper how each molecule exists in space. It is important to recognize that these 3-D representations represent a "snapshot in time" depicting how the molecule can exist. All of the substances can be rotated in three dimensions and will result in a different image.
7. In all of the 3-D representations, colors have been chosen to represent atoms: grey represents carbon (C); white represents hydrogen (H); red represents oxygen (O); blue represents nitrogen (N); and yellow represents fluorine (F). Aromatic bonding within five and six membered "rings" are represented by dashed (----) lines within the ring structures.

## AM-2201

1-[(5-fluoropentyl)-1H-indol-3-yl]-(naphthalen-1-yl)methanone

Formula: $C_{24}H_{22}FNO$

10 largest peaks:

| 359 | 999 | 284 | 519 | 232 | 472 | 342 | 447 | 358 | 436 |
|---|---|---|---|---|---|---|---|---|---|
| 127 | 314 | 360 | 250 | 144 | 206 | 270 | 168 | 155 | 150 |



 

## UR-144

(1-pentylindol-3-yl)-(2,2,3,3-tetramethylcyclopropyl)methanone

Formula: $C_{21}H_{29}NO$

10 largest MS peaks:

214  999 | 144  186 | 215  159 | 296  124 | 311  99 |

252   76 | 229   67 | 238   65 | 130   57 |  43  56 |



 

## MAM-2201

(1-(5-fluoropentyl)-1H-indol-3-yl)(4-methyl-1-naphthalenyl)-methanone

Formula: C$_{25}$H$_{24}$FNO

10 largest MS peaks:

373 999 | 298 585 | 356 582 | 232 555 | 372 465 |

144 366 | 115 314 | 141 310 | 284 257 | 374 250 |






## XLR-11

(1-(5-fluoropentyl)-1H-indol-3-yl)(2,2,3,3-tetramethylcyclopropyl)methanone

Formula: $C_{21}H_{28}FNO$

10 largest MS peaks:

232 999 | 144 188 | 233 158 | 314 115 | 329 90 |

270 76 | 247 67 | 116 60 | 256 59 | 130 56 |



 

The government's claim is that all four of these substances are similar to the following controlled substance:

**JWH-018**

1-pentyl-3-(1-naphthoyl)indole

Formula: $C_{24}H_{23}NO$

10 largest MS peaks:

341  999 | 127  883 | 214  586 | 144  574 | 284  554 |

155  448 | 324  409 | 340  402 |  43  395 | 128  257 |

## WHAT ARE THE "CHEMISTRY ELEMENTS" INCLUDED IN THE CONTROLLED SUBSTANCES ANALOGUE AND ENFORCEMENT ACT OF 1986?

The "chemistry elements" I have been asked to evaluate related to the reporting of controlled substances are based on the requirements of Controlled Substances Analogue and Enforcement Act of 1986 (CSAEA). This federal law addresses "controlled substance analogue(s)" and an evaluation of what constitutes a "controlled substance analogue."

**Controlled Substance Analogue Enforcement Act of 1986**
P.L. 99-570. Subtitle E, Title I.

---

### SEC. 1202. TREATMENT OF CONTROLLED SUBSTANCE ANALOGUES
Part B of the Controlled Substances Act is amended by adding at the end of the following new section:

"TREATMENT OF CONTROLLED SUBSTANCE ANALOGUES"
"SEC 203. A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of this title [Title I; "Enforcement"] and title III ["Interdiction"] as a controlled substance in schedule I."

### SEC 1203. DEFINITION.
Section 102 of the Controlled Substances Act (21 U.S.C. 802) is amended by adding at the end thereof the following:

"(32)(A) Except as provided in subparagraph (B), the term `controlled substance analogue' means a substance —
 "(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
 "(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulent, [sic] depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
 "(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

 "(B) Such term does not include ---
  "(i) a controlled substance;
  "(ii) any substance for which there is an approved new drug application;
  "(iii) with respect to a particular person any substance, if an exemption is in effect for investigational use, for that person, under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) to the extent conduct with respect to such substance is pursuant to such exemption; or
  "(iv) any substance to the extent not intended for human consumption before such an exemption takes effect with respect to that substance.".

Page 8

## HOW DOES THE CSAEA RELATE TO THIS CASE?

It is important to recognize that there are two (or possibly three) different required elements in Part A of this definition to determine the status of a substance as "controlled." There are scientific considerations and legal considerations in this CSAEA. Moreover, because the language is referenced in the government's argument, and because reference is made to the purported claims of the government's chemist's basis for a conclusion, the corresponding language will be referenced in this discussion. This report will address the scientific requirements, which in turn are impacted by the verbiage in the CSAEA.

## ARE THE CLAIMS OF GOVERNMENT'S WITNESSES RELATED TO "SUBSTANTIALLY SIMILAR" SCIENTIFICALLY VALID?

Since its inception, the "Analogue Act" has been subject to discussions and disagreements among forensic drug analysts. These discussions have not resolved the non-descript language of the ACT. Neither the CSAEA nor any legislation following the CSAEA, nor any discussions in the scientific community define either "analogue" or "substantially similar." For a scientist to attach a definition to either of these terms which garners support and acceptance in the scientific community has not yet happened and probably never will. This tasking has been a challenge since 1986, and still has not yet been resolved. Anyone with a scientific background who attempts to define the non-specific terminology "substantially similar" will encounter more contrary arguments than agreements. This term has no consensus definition with acceptance in the scientific community because the term "substantially similar" is referenced as a legal concept rather than as a scientific concept.

To report control status of any substance based on the CSAEA, the molecular structure of the molecule and its effect on the central nervous system must be considered independently. Therefore, for a forensic chemist to report that a substance is controlled as an analogue (which is an undefined term) which meets the requirements of the Daubert standard, that determination related to a controlled substance must meet the requirements for relevance and reliability. The person who prepares the report or makes the claim in court must demonstrate with relevance and reliability that the substance which is being reported as "controlled" has defined similarities in chemical structure and has a "stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of a controlled substance listed in schedule I or II." Neither of these requirements has been met.

## THE ABSENCE OF SCIENTIFIC DEFINITIONS IN CSAEA TERMINOLOGY

Considering only the question of the substances which have been named in the subject complaint, the CSAEA does not elaborate, define, or expand upon the terms "substantially

similar" or "chemical structure" or "analogue." Nor are there any applicable scientific definitions for any of these terms. Even considering the requirements of the *Frye* standard which has become one of the de facto elements of Daubert, a requirement for the forensic chemist reporting and testifying as an expert witness includes a determination of whether the evidentiary conclusion was formulated using generally accepted methods by experts in the particular field. There is no scientifically accepted definition of a "chemical structure of the substance [which] is substantially similar to the structure of a controlled substance in schedule I or II."

It is logically impossible from any perspective to argue that two chemicals are substantially similar, and at the same time acknowledge that they possess differences in chemical formulations, synthesis protocols, molecular weights, electronegativity, bond lengths, and bond angles. And when these variances in chemical formulation result in divergences in chemical properties and resulting analytical data, the "substantially similar" and "chemical structure" arguments become even more illogical and move even further from the Daubert requirements for "reliability."

Standards are not a choice of the person claiming to be an "expert witness." Nor can standards in forensic science be formulated individually to fit the argument of either the government, or the defense for that matter. Standards in forensic science cannot be formulated individually. This is frightening when the defense engages in this practice; however, this practice is even more frightening when the government engages an expert witness who formulates a definition which has no "standard controlling its operation" nor "which has attracted widespread acceptance in the relevant scientific community" (See Daubert vs. Merrill Dow Pharmaceutical). Expert witnesses are entitled to their own opinions which must be substantiated by supporting reliable data; however, expert witnesses are not entitled to the privilege of creating their own facts. Claiming that "the chemical structure [of a substance] is substantially similar to the chemical structure of a controlled substance in schedule I or II" without a detailed explanation and reference to an acceptable standard or definition, in effect elevates the expert into the role of a law maker rather than as an expert expressing an opinion based on a scientific standard. In actuality the substance (usually a purported drug) is being charged because the expert in effect is saying that the substance is controlled under the CSAEA. But then the argument becomes even more tenuous because the expert will usually demonstrate by using two dimensional line and letter chemical drawings to illustrate "structural similarity." With these types of drawings the expert witness runs a minimal risk, usually successfully, of "fooling the mind by fooling the eye" of the courtroom participants who have no idea what the chemical notation means.

In order for an expert witness to address the salient question on the merits of the "similarity" argument, the expert must determine whether "the chemical structure" of the alleged analogue "is substantially similar to the chemical structure of a controlled substance." And this must be accomplished by using the most accurate representations of the chemical structures which are

available and which most closely represent the true molecular configuration. Two dimensional structures using stick and letter drawings of molecules do not even begin to represent real "chemical structures" which exist in three dimensional space. Any comparison of chemical structures which relies upon an evaluation of two dimensional representations for the purpose of justifying or arguing structural similarity is problematic at best, and is an aberration of reality which will unintentionally mislead a non-scientist into believing an *ipse dixit* argument seriously at odds with reality. Two dimensional stick and letter diagrams are misleading. Two dimensional cylindrical bond "stick and ball" diagrams, while being a bit better, still fall short of accurately depicting the reality of chemical structure to determine structural similarity. Three dimensional cylindrical molecular structures in combination with three dimensional "cluster" molecules are much better representations for scientists (and especially for non-scientists) to determine whether the requirements of reliable and relevant evidence exist. If so, then the discussion of molecular structure can move forward.

Line and letter drawings depict no stereochemistry; nor do they show molecular structure; nor do they even include all of the atoms which comprise the individual "chemicals" which are being reported. It is easy to understand how a non-chemist based on intimidation could look at these drawings without understanding what they represent and agree with anything a chemist might choose to say about them. The interpretation of scientific notation by non-scientists, even by those trained in the law, is problematic without a basic understanding of what this "notation" means. It is even more problematic for a scientist to use chemical notations in a non-scientific forum like a courtroom without direct explanations of exactly what those notations mean.

Any reporting of or testimony related to structural similarity between two different molecules based on a visual inspection of two dimensional drawings does not meet the requirements for scientific reliability in the laboratory. In the absence of corroborating data and more information, there are few if any credible forensic chemists who would base any conclusion of similarity solely on two dimensional diagrams. In fact, the first question a credible forensic chemist asks in any kind of a forensic analysis where a comparison is the basis for a conclusion is: Are there differences in what is being observed in the comparison? And if differences do exist, they will usually result in a qualified conclusion that the entities being compared are different. Any forensic chemist who prepares a report which references a "similarity" of any kind without noting the differences and explaining how those differences impact the conclusion, should be discredited in the courtroom. This means that during the guilt/innocence phase of a trial with a threshold of "beyond a reasonable doubt," the misleading representation of molecular structure of a controlled substance by a stick and letter diagram to demonstrate that "the chemical structure of the substance is substantially similar to the structure of a controlled substance in schedule I or II" has justification for credible attacks on cross examination. A forensic chemist will usually not testify in court unless his/her conclusions are "beyond a reasonable doubt" in the guilt/innocence phase of a trial; nor should a forensic chemist testify in the sentencing phase of a trial without meeting the "preponderance of evidence" standard. In

either situation, the forensic chemist must consider all available information, including the best molecular representation and data available in formulating a conclusion. Any credible forensic chemist who bases a conclusion on anything other than relevancy and reliability is not meeting the standards of Daubert or the applicable Rules of Evidence. Any credible forensic chemist who bases a conclusion on selective interpretations of verbiage without considering alternative explanations is not conforming to the requirements for scientific objectivity.

Credible analysts who evaluate suspected controlled substances in forensic science laboratories are expected to present the "best evidence" for any conclusion regarding "similarity with more than an "it looks the same to me" justification. That is why minimum standards have been established by the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG) in forensic drug analysis. While there are no "formalized requirements," SWGDRUG has established recommendations which are accepted as pro-forma requirements with reviewable data in the form of molecular elucidation techniques such as gas chromatograph/mass spectroscopy and infrared spectroscopy to identify and to report molecular structures in controlled substance cases. That requirement is expanded to include any conclusions which appear in forensic drug analysis reports. While two dimensional stick and letter representations have been used as a limited illustrative way to represent what a molecule looks like with the two dimensional constraints of paper, any additional conclusions related to chemical properties in forensic drug identifications must be supported by relevant and reliable analytical data. These two dimensional diagrams intended as representations of molecular structures are no longer sufficient to form the basis for identifying an unknown substance leading to a conclusion related to whether a substance is controlled.

The second part of the CSAEA states that "(i) The substance [analogue] has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II." It is problematic that, in the absence of a statutory categorization by a legislative body, a forensic chemist can consider and then report the effects on the central nervous system as "stimulant, depressant, or hallucinogenic." And that is before any consideration is given to accepting whether those effects are similar or greater than the controlled substance to which the purported analogue is being compared. Any such assertion by an expert witness must be supported by data. And no such data is available to support such a claim.

## CONCLUSION

In order for an analyst to address the salient question on the merits of the "similarity" argument, the forensic chemist must determine whether "the chemical structure" of the alleged analogue "is substantially similar to the chemical structure of a controlled substance." And this must be

accomplished by using the most accurate representations of the chemical structures which are available and which most closely represent the true molecular configuration. Two dimensional structures using stick and letter drawings of molecules do not even begin to represent real "chemical structures" which exist in three dimensional space. Any comparison of chemical structures which relies upon an evaluation of two dimensional representations for the purpose of justifying or arguing structural similarity is problematic at best, and is a serious aberration of reality which will unintentionally mislead a non-scientist into believing an *ipse dixit* argument seriously at odds with reality. Two dimensional stick and letter diagrams are misleading. Two dimensional cylindrical bond "stick and ball" diagrams, while being a bit better, still fall short of accurately depicting the reality of chemical structure to determine structural similarity. Three dimensional cylindrical ball and stick molecular structures in combination with three dimensional "cluster" molecules are better representations for scientists (and especially for non-scientists) to visualize molecular structures in evaluating the conformance to reliability requirements. Three dimensional molecular models must be included as a part of any discussion related to "structural similarity." As important, the discussion must also include the physical properties of substances which are being compared. The chemistry properties of the substances should also be included in the discussion.

Any conclusions which compare **JWH-018** to **AM-2201, UR-144, XLR-11**, and **MAM-2201** without meeting the basic requirements of the scientific reasons delineated above are invalid and unreliable.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature: Joseph P. Bono]*                                              July 12, 2013

Joseph P. Bono                                                              Date
FORENSIC CONSULTING, LLC
P.O. Box 2509
Leesburg, Virginia 20177
Telephone: 703-303-3851
E-mail: bonojp@gmail.com
FEIN: 26-1932169

# Joseph P. Bono
## PO Box 2509
## Leesburg, Virginia 20177
Cell: (703) 303-3851
Home: 703-327-9990
bonojp@gmail.com

## EDUCATION:

| | | | |
|---|---|---|---|
| Bachelor of Science | Chemistry | University of Missouri | 1969 |
| Master of Arts | Political Science | University of Missouri | 1979 |

## PROFESSIONAL POSITIONS:

**Indiana University Purdue University Indianapolis (IUPUI), Forensic and Investigative Sciences Program**
    Indianapolis, Indiana         October 2007 – July 2011
    Adjunct Instructor

**United States Secret Service Laboratory, Forensic Services Division**
    Washington, DC         July 2006 – September 2007
    Laboratory Director

**Drug Enforcement Administration, Office of Forensic Sciences**
    Arlington, Virginia         November 2002 – July 2006
    Quality Manager

**Drug Enforcement Administration, Special Testing and Research Laboratory**
    Dulles, Virginia         July 2000 - November 2002
    Laboratory Director

**Drug Enforcement Administration, Office of Forensic Sciences**
    Arlington, Virginia         November 1999 - July 2000
    Chief, Laboratory Operations Section

**Drug Enforcement Administration, Mid-Atlantic Laboratory**
    Washington, DC         February 1999 - November 1999
    Laboratory Director

**Drug Enforcement Administration, Office of Forensic Sciences**
    Arlington, Virginia         September 1996 - February 1999
    Program Manager

**Drug Enforcement Administration, Special Testing and Research Laboratory**
    McLean, Virginia         June 1991- September 1996
    Supervisory Chemist

**Drug Enforcement Administration, Mid-Atlantic Laboratory**
    Washington, DC         October 1988 - June 1991
    Senior Forensic Chemist

**Naval Investigative Service Regional Forensic Laboratory San Diego**
    San Diego, California         1986-1988
    Senior Forensic Chemist

September 2012

**Naval Investigative Service Regional Forensic Laboratory Pacific**
    Pearl Harbor, Hawaii        1984-1986
    Forensic Chemist
**Naval Investigative Service Regional Forensic Laboratory Europe**
    Naples, Italy        1981-1984
    Laboratory Director
**St. Louis County Police Department Laboratory**
    Clayton, Missouri        1974-1981
    Criminalist / Laboratory Director

## CONTRACTS

**ASCLD Consulting**        2007-2010
Business Manager and Primary Consultant
Responsible for preparing laboratories for ASCLD/LAB accreditation under the International Program.

**Forensic Specialist/Instructor**
**United States Department of Justice**    2007-2008
**International Criminal Investigative Assistance Training Program**
Responsible for developing and teaching forensic science training programs in Bogotá, Colombia

**University of Central Florida**
**Digital Forensic Certification Board (DFCB)**    2007-2008
Responsible for coordinating processes for the development of a certification program for digital forensics practitioners and managers

## INTERNATIONAL LIAISON ACTIVITIES AND FOREIGN COUNTRIES VISITED IN AN OFFICIAL CAPACITY WITH THE DRUG ENFORCEMENT ADMINISTRATION, THE UNITED STATES SECRET SERVICE, AND THE US DEPARTMENT OF JUSTICE (AS A CONTRACT EMPLOYEE)

    Caracas, Venezuela - 1994, 1995, 1996
    Georgetown, Guyana - 1996
    Guayaquil and Quito, Ecuador - 1996
    Vienna, Austria – 2000, 2003
    Muscat, Oman - 2001
    Islamabad, Pakistan - 2001
    Taipei, Taiwan - 2001
    Beijing, China – 2002
    Istanbul, Turkey – 2002, 2003
    Wiesbaden and Berlin, Germany – 2002
    Linkoping, Sweden – 2003
    Rome, Italy – 2003
    Lyon, France – 2001, 2003, 2004
    Hong Kong – 2002, 2005

September 2012

    Bogotá, Colombia – 2006
    Porto, Portugal – 2007
    Bogotá, Colombia – 2008


## INTERNATIONAL LIAISON ACTIVITIES WITH AAFS

| | |
|---|---|
| Bogotá, Colombia | 2005 |
| Santiago, Chile | 2005 |
| Buenos Aires, Argentina | 2005 |
| Parma, Italy | 2008 |
| Paris, Lyon, Montpelier, France | 2010 |
| Rome, Italy | 2012 |

## INVITED LECTURER AS AAFS OFFICER (2007)
    Italy   University of Viterbo and University of Parma

## PROFESSIONAL AFFILIATIONS
**American Academy of Forensic Sciences (AAFS),**
    AAFS MEMBERSHIP HISTORY

| | |
|---|---|
| Section: | Criminalistics |
| 1978 | Elected Provisional Member |
| 1979 | Elected Member |
| 1980 | Elected Fellow |

    AAFS ACTIVITIES

| | |
|---|---|
| 1995-96 | Program Chair, Criminalistics Section |
| 1996-97 | Secretary, Criminalistics Section |
| 1996-98 | AAFS Council |
| 1996-98 | AAFS Membership Committee |
| 1997-98 | Chair, Criminalistics Section |
| 1997-98 | AAFS Nominating Committee |
| 1998-99 | Workshops Chair, AAFS 51st Annual Meeting (Orlando) |
| 1999-2000 | Breakfast Seminars Chair, AAFS 52nd Annual Meeting (Reno) |
| 2000-01 | Plenary Session Chair, AAFS 53rd Annual Meeting (Seattle) |
| 2001-02 | Breakfast Seminars Chair, AAFS 54th Annual Meeting (Atlanta) |
| 2001-06 | Member, Policy & Procedure Committee |
| 2003-06 | Fellow at Large, AAFS Board of Directors |
| 2003-04 | AAFS Program Committee Co-chair, 56th Annual Meeting (Dallas) |
| 2004-05 | AAFS Program Committee Chair, 57th Annual Meeting (New Orleans) |
| 2004-05 | Chair, Regional Workshops Task Force |
| 2005-06 | AAFS Executive Committee |
| 2005-06 | Chair, *"Forensic Science and the Rule of Law: The Role of Discovery in Today's Crime Laboratory"* Special Session |
| 2006-07 | AAFS Vice President |
| 2006-07 | Chair, Membership Committee |
| 2006-10 | Board of Trustees, Forensic Sciences Foundation |
| 2007-09 | AAFS Secretary |

September 2012

| | |
|---|---|
| 2007-14 | Long Term Planning Committee |
| 2009-10 | AAFS President-Elect |
| 2010-11 | AAFS President |
| 2011-12 | AAFS Past-President |

**Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG)**
   Organizer, meeting facilitator, and Secretariat: 1997 - 2005
This scientific working group has been a joint project of the Office of National Drug Control Policy (ONDCP) and the Drug Enforcement Administration (DEA).

**International Drug Profiling Conference (IDPC)**
   Organizer and meeting facilitator: 2002-2005
This conference is another joint project of the Office of National Drug Control Policy (ONDCP) and the Drug Enforcement Administration (DEA).

**INTERPOL Forensic Science Symposium**
   Organizing Committee 2002-2004

**PROFESSIONAL ORGANIZATIONS**
Midwestern Association of Forensic Scientists (MAFS) (1976 - Present)
Mid-Atlantic Association of Forensic Scientists (MAAFS) (1999 - 2010)
American Society of Crime Laboratory Directors (ASCLD) (1999 - 2008)
American Society of Crime Laboratory Directors (ASCLD) Emeritus Member (2008-Present)
American Society of Crime Laboratory Directors/Laboratory Accreditation Board
   (ASCLD/LAB) Board of Directors (2001 - 2005)

**American Board of Criminalistics (ABC) 2006-Present**
   **Diplomat**
   ABC Examination Committee member. Participated in the 2006 development of the drug analysis certification examination.

**Appointment by Commonwealth of Virginia Governor Mark Warner - 2005**
   **Reappointed by Governor Tim Kaine - 2008**
   Scientific Advisory Committee, Four year term, July 2005 - June 2009
      Elected Chairman 2005-2007
   Forensic Science Board
      Member (2005-2009)
      Elected Chairman (2007 - 2009)

**Appointment by the Mayor of Indianapolis, Indiana**
   Marion County Forensic Services Board, March 2008 – July 2011

September 2012

## AWARDS

| | | |
|---|---|---|
| 1995 | US Department of Justice | Special Act Award |
| 1998 | US Department of Justice | Exceptional Performance Award |
| 2001 | US Department of Justice | Outstanding Contribution to the Federal Service Award |
| 2001 | US Department of Justice | Exception Performance Award |
| 2005 | US Department of Justice | Special Act Award |
| 2006 | American Academy of Forensic Sciences Criminalistics Section | |
| | Mary E. Cowan Distinguished Service Award Honoree | |
| 2007 | Distinguished Alumni, Department of Chemistry, University of Missouri-St. Louis | |

## PUBLICATIONS

"The Forensic Scientist in the Judicial System"
*Journal of Police Science and Administration*, vol 9, No. 2, pg 160.

Cited Contributor:
A. Svensson, O. Wendel, B. Fisher,
**Techniques of Crime Scene Investigation**, 3rd ed.
(New York: Elsevier, 1981), pxv.

"Quantitative Analysis of Methamphetamine
by Packed Column Gas Chromatography"
"MICROGRAM," Vol XX, No. 9, September 1987.

"Separation and Identification of Methamphetamine
and Dimethylamphetamine by Infrared Spectrophotometry"
"MICROGRAM," Vol XXI, No. 5, May 1988.

"Chemical and Pharmacological Aspects of Anabolic Steroids"
*Proceedings of the American Academy of Forensic Sciences*,
Vol I, February 1995, Pg 21.

**Drug Abuse Handbook**, Edited by S. Karch, CRC Press LLC,
Boca Ratan, FL; 1998;
Author, Chapter 1 "Criminalistics - Introduction to Controlled Substances,"
pp. 1-76.

"Forensic Science Needs a Lot Less Finger-Pointing and a Lot More Solutions,"
*The Prosecutor*, April/May/June, 2010, pp. 12-17.

"Past President's Editorial," J *Forensic Sci*, March 2011, Vol. 56, No.2
doi: 10.1111/j.1556-4029.2011.01696.x

"Commentary on the Need for a Research Culture in the Forensic Sciences," 58 *UCLA LAW REVIEW*, 781 (2011), pp. 781-787.

September 2012