**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **Plaintiff** | | |
| **v.** | : | **Civil Action No.  ELH-12-3501** |
| **$2,200,000.00 in U.S. CURRENCY AND** | : | |
| **34 MONEY ORDERS AND 102 CHECKS** | | |
| **WRITTEN TO M&C WHOLESALE AND** | : | |
| **DANIEL BOWLES,** | | |
| **Defendant** | : | |
| | : : : : : : : : : | |

**GOVERNMENT'S RESPONSE TO CLAIMANT'S MOTION TO DISMISS**

The United States of America, by its counsel, makes this response to the Claimant's

Motion to Dismiss Government's First Amended Verified Complaint for Forfeiture ("First

Amended Complaint").[1]   For the following reasons, the Controlled Substances Analogue

Enforcement Act (the "Analogue Act") is not unconstitutionally vague as applied in this case, the

government has met its burden to put forward facts in the First Amended Complaint to support a

reasonable belief that it will be able to meet its burden of proof at trial on the *mens rea* elements

of the underlying crime, the Claimant's fact-based expert testimony is not a proper basis for a

motion to dismiss, and although tracing is not required at this stage of the litigation, the First

Amended Complaint alleges facts sufficient to trace the Defendant Property to violations of the

Analogue Act. Thus, the Claimant's Motion to Dismiss should be DENIED.

I.      **INTRODUCTION**

The First Amended Complaint describes in detail how the Claimant sold substances with

a substantially similar chemical structure and similar narcotic effects as a scheduled controlled

dangerous substance, and knew that the end-users of those products were consuming them for

---

[1] Counsel for the government has conferred with Claimant's counsel and both parties believe that
the Claimant's filing of a renewed motion to dismiss addressed the Court's request for a status
update (Doc. No. 21).

their narcotic-like effects.  Although the substances that the Claimant sold were not scheduled

controlled dangerous substances at the time they were sold, under the Analogue Act those

substances are treated identically to scheduled controlled substances. Claimant challenges the

sufficiency of the First Amended Complaint alleging (1) the Analogue Act is unconstitutionally

vague; (2) the government has failed to allege that the Claimant knew the substances it was

selling were controlled substance analogues; (3) that, when considering the motion to dismiss,

the Court should consider only Claimant's experts' opinions and make a factual finding that the

substances the Claimant was selling are not controlled substance analogues; and (4) that the

government has not sufficiently traced the Defendant Property to the illegal sales of analogue

substances.

Each argument fails.  First, the Fourth Circuit and every other Circuit Court to address

the constitutionality of the Analogue Act has held that it is not unconstitutionally vague, and

recently two district court cases found that the Act was not unconstitutionally vague as applied to

two of the substances at issue in the present case.  Second, the First Amended Complaint

provides both direct and circumstantial evidence establishing that the Claimant knew that the

substances it sold had narcotic-like effects, which under the law is also sufficient to establish that

it knew those products were substantially similar in chemical makeup to scheduled controlled

substances.  Third, the Claimant's fact-based arguments relying on expert opinion testimony

outside the four-corners of the complaint are not a valid basis for a motion to dismiss.  Fourth,

the government is not required to trace the Defendant Property to the alleged underlying offenses

until trial, but at trial the facts alleged in the complaint, when proven, will do so by showing that

all of the Claimant's business sales involved analogue substances and violated the Analogue Act.

The Analogue Act was designed to prevent individuals from making small changes to the

chemical makeup of scheduled narcotics to evade the prohibitions of the drug laws while

distributing substances which, with respect to their narcotic-like effect, are functionally the same

as the scheduled substances.  Here, the Claimant is attempting to do precisely that – to argue that

because he has remained ahead of the DEA's drug scheduling process, he can distribute the

financial equivalent of narcotic substances with impunity.  This conduct is precisely what the

Analogue Act was designed to prevent.

II.      **FACTUAL BACKGROUND**

The declaration attached to the First Amended Complaint describes in detail the

government's evidence that the Claimant operated a company that manufactured exclusively

controlled substance analogues, sold them to retail stores specializing in tobacco-related products

throughout the country, and then received payment in the form of bank checks and personal

checks that were deposited into the account from which the $2,200,000 portion of the Defendant

Property was seized.  The following is a brief summary of those facts.

A.      **Analogue Substances Involved**

This case involves three substances: UR-144, AM-2201, and MAM-2201.  The First

Amended Complaint alleges specifically that each of these substances have a substantially

similar chemical structure as JWH-018 (made a Scheduled I controlled dangerous substance on

March 1, 2011) and has a similar effect when consumed as JWH-018, based on analysis

completed by DEA chemists.  *See* Declaration of Thomas Adams attached to First Amended

Complaint, Doc. No. 18 ("Adams Decl.") ¶¶ 8 (XLR11 and UR-144) 16, 22-23, 27 (AM-2201);

46 (MAM-2201; UR-144).[2]

### B.      Sale of Analogues to Retail Tobacco-Related Stores in Maryland

The Claimant is a company called M&C Wholesale, which operated out of a commercial

location in Laguna Niguel, California. Adams Decl. ¶¶ 47-49.  As discussed more fully below,

the Claimant's business exclusively involved the sale of UR-144, AM-2201, and MAM-2201.

In the fall and winter of 2011, the government made several undercover purchases of

products containing AM-2201 from the Tobacco Stop, a retail business that sold tobacco-related

supplies, located in Baltimore, Maryland.  Adams Decl. ¶¶ 10-27.  An employee at the store told

the undercover agent making the purchase that although the products were labeled as "potpourri"

that was not intended for human consumption, it was designed to be smoked.  *Id.* ¶ 15.  The store

sold one gram of the product for $20.  *Id.* ¶ 14.  DEA chemists analyzed the products that the

undercover agent purchased and determined that they contained AM-2201.  *Id.* ¶ 16. The

government subsequently executed a search warrant on the Tobacco Stop in December 2011, and

determined from invoices that the products bought in the undercover purchases were supplied by

Daniel Bowles ("Bowles"), an employee of the Claimant.  *Id*. ¶¶ 25-26.

In the spring and summer of 2012, the government, through a confidential source, twice

called Bowles and ordered additional products with various "brand" names.  Adams Decl. ¶ 28.

These products were sent from the Claimant by Federal Express to a retail store called "The

Dragon's Den Smoke House" also located in Baltimore, Maryland.  *Id.* ¶¶ 31, 43-45.  The

government recovered these products and determined that they contained UR-144 and MAM-

2201.  *Id.* ¶¶ 37, 46.  During the calls with Bowles, the confidential source inquired three times

---

[2] Congress passed a law making AM-2201 a schedule I controlled dangerous substance on July 7, 2012. *See* S. 3187, 112th Cong. (2012), 78 FR 664-01, 2013 WL 30029 (enacted July 7, 2012); 21 C.F.R. § 1308.11(g)(11).  Adams Decl. ¶ 9.

about which products were the strongest when smoked, but only once did Bowles state that his products were not intended for smoking. *Id.* ¶ 41.

### C.      Execution of Search Warrant at Claimant's Property

In the summer of 2012, the government executed a search warrant on the Claimant's commercial location in Laguna Niguel, California. Adam Decl. ¶ 52. The government recovered several thousand pounds of products containing UR-144 and MAM-2201, several thousand pre-packaged bags of products containing those substances, and chemicals used to make those products. *Id.* ¶¶ 52-56. The products were labeled with the same "brand" names as the products that were sent to the Baltimore tobacco shops. *Id.* Additionally, a Federal Express driver who made pickups at the Claimant's location told the government that he had witnessed a number of people handling piles of a green plant-like substance. *Id.* ¶ 49. Finally, on the day that the search warrant was executed, Bowles referred to UR-144 by name when speaking with the agents executing the search warrant, indicating that he was aware that substance was being added to the Claimant's products. *Id.* ¶ 68.

### D.      Operation of Claimant's Business

The First Amended Complaint contains substantial evidence that the Claimant attempted to put forward a thin venire of legality while distributing analogue substances, fully intending them to be consumed as narcotics. Specifically, a second confidential source overheard Bowles and other employees of the Claimant discussing that Claimant's products were "smoked" and that it made the consumers of the products "high." Adams Decl. ¶ 69.[3] Nevertheless the

---

[3] The government need not reveal the identity of a confidential source when relying on information from that source to establish probable cause to get a search warrant. *See United States v. Gray,* 47 F.3d 1359, 1365 (4th Cir. 1995). As discussed below, the "reasonable belief" standard applicable in a motion to dismiss a forfeiture complaint is less burdensome than the probable cause standard, so accordingly the government need not reveal the identity of a confidential source to satisfy its burden under that standard in a forfeiture complaint either. *See*

Claimant attempted to give the appearance that it was in compliance with the law.  The

confidential source stated that the Claimant provided its customers lab reports indicating that its

products did not contain certain controlled substances – giving the appearance of compliance –

while failing to note that its products contained the analogue substances at issues in this case.  *Id.*

¶ 70.  Furthermore, the Claimant instructed its employees to avoid making incriminating

statements – such as using the terms "smoke" or "flavor" – when discussing the products with

potential purchasers.  *Id.* ¶ 72.  These reflect that the Claimant attempted to evade by sleight of

hand the application of the drug laws to the distribution of products that for all intents and

purposes were narcotics – precisely the conduct the Analogue Act was designed to combat.

### E.      Funds Involved in Analogue Sales

The government determined that retail Tobacco stores that purchase analogue products

from the Claimant paid for those products using business checks, bank checks, and money

orders.  Adams Decl. ¶ 83.  The Defendant Property constitutes those checks and money orders,

described in more detail below, and the funds in the bank account into which those checks and

money orders were deposited.

The checks and money orders were deposited into a Wells Fargo bank account numbered

XXXXXX0553 in the name of Daniel Bowles and Chelsea Bowles, Daniel Bowles's sister-in-

law.  *Id*. ¶¶ 77-79.  Accordingly, the government determined that the funds in that account were

traceable to the sale of the analogue products and seized those funds pursuant to seizure warrants

---

*also United States v. $4,790.00 in U.S. Currency,* 2005 WL 311591, at *5 (C.D. Ill. 2005) (the
Government need not reveal identity of confidential informant if all confidential informant did
was provide the tip that led to the seizure of the currency, and the Government will establish the
forfeitability of the currency on evidence developed after the tip was received).

issued by Magistrate Judge Stephanie A. Gallagher on July 25, 2012. *Id.* ¶¶ 84-85; *see also* D.

Md. Misc. Nos. 12-3453-SAG; 12-3454-SAG.[4]

During the search of the Claimant's location in Laguna Niguel, California, the

government seized checks and money orders made payable to Bowles and the Claimant that were

sent from retail stores that sell tobacco-related products. Adams Decl. ¶¶ 57, 81. Those checks

are listed in attachment A of the First Amended Complaint.

Additionally, the government searched Bowles's residence in San Juan Capistrano,

California on July 25, 2012, with Bowles's consent. Adams Decl. ¶ 58. During that search, the

government seized the checks and money orders listed in Attachment B of the First Amended

Complaint, all of which were sent from retail tobacco stores and which were payable to the

Claimant or Bowles. *Id.* ¶ 61.

Finally, on July 27 and August 1, 2012, the government seized Federal Express packages

addressed to the Claimant. Adams Decl. ¶ 63. Those packages contained (1) additional checks

and money orders from tobacco stores made payable to Bowles and the Claimant, and (2)

products containing analogue substances being returned to the Claimant. *Id.* ¶ 65. Those checks

and money orders are listed in Attachment C of the First Amended Complaint. *Id.*

III.    **LEGAL BACKGROUND**

A.      **Basis for Forfeiture of the Defendant Property**

The First Amended Complaint alleges that the Defendant Property is subject to forfeiture

because it constitutes the proceeds of the sale of controlled substance analogues, it was intended

to purchase controlled substance analogues, or it was intended to facilitate violations of the

---

[4] Although the Court is not bound by the issuance of the warrants, by issuing the warrants the
Magistrate Judge Gallagher found probable cause – a higher burden than the reasonable belief
standard applicable here – that the funds in the account were subject to forfeiture as involved in
analogue sales.

Controlled Substances Act.  Specifically, under 21 U.S.C. § 881(a)(6), property is subject to

forfeiture if it constitutes: (1) money, negotiable instruments, securities and other things of value

furnished and intended to be furnished in exchange for a controlled substance in violation of the

Controlled Substances Act; (2) proceeds traceable to such an exchange; and (3) money,

negotiable instruments, and securities used and intended to be used to facilitate a violation of the

Controlled Substances Act.   As stated below, substances that fit the definition of controlled

substance analogues are treated the same as substances that are listed in Schedule I of the

Controlled Substances Act.

B.       **"Reasonable Belief" Standard for Reviewing Forfeiture Complaint**

To survive Claimant's motion to dismiss, the First Amended Complaint must contain

sufficiently detailed facts to support a reasonable belief that the government will be able to meet

its burden at trial.  Supplemental Rule G(2) sets forth what a civil forfeiture complaint must

contain.  Among other things, the complaint must describe the property subject to forfeiture, set

forth the basis for jurisdiction and venue, name the statutory authority on which the forfeiture

action is based, and "state sufficiently detailed facts to support a reasonable belief that the

Government will be able to meet its burden of proof at trial."  Fed. R. Civ. P. Supplemental R.

G(2)(a)-(f).  The quoted language, which appears in Rule G(2)(f), is a codification of the Fourth

Circuit's decision in *United States v. Mondragon,* 313 F.3d 862 (4th Cir. 2002)*,* which

established the standard for filing a civil forfeiture complaint under the predecessor to Rule G.

This standard is distinct from and less stringent than the probable cause standard applicable with

respect to the issuance of seizure warrants. *United States v. $78,850.00 in U.S. Currency*, 444 F.

Supp. 2d 630, 638-39 (D.S.C. 2006) (a complaint may not be dismissed for lack of probable

cause; all the Government must do is set forth sufficient facts to permit a "reasonable belief" that

the Government will be able to satisfy its burden of proof at trial).

Motions to dismiss a complaint are filed pursuant to Rule G(8)(b), which says that "the

sufficiency of the complaint is governed by Rule G(2)."  Fed. R. Civ. P. Supplemental R.

G(8)(b)(ii).  In other words, a complaint is sufficient, and a motion to dismiss the complaint must

be denied, if the complaint satisfies the "reasonable belief" standard in Rule G(2)(f).  *See United*

*States v. $74,500 in U.S. Currency,* 2011 WL 2712604, *2 (D. Md. July 11, 2011).[1]  As Judge

Richard D. Bennett stated in *$74,500*, the Government does not have to prove its case just to get

in the courthouse door; it need only show that the facts set forth in the complaint as sufficient to

create a *reasonable belief* that the Government will be able to meet its burden of proof *at trial*.

*Id.* (emphasis added).  *See also* Fed. R. Civ. P. Supplemental R. G(8)(b)(ii) ("The complaint may

not be dismissed on the ground that the Government did not have adequate evidence at the time

the complaint was filed to establish the forfeitability of the property.").

As in all civil cases, when considering a motion to dismiss, a court must assume all the

facts alleged in the complaint to be true. *United States v. Funds in Amount of $101,999.78,* 2008

WL 4222248, at *1 (N.D. Ill Sept. 22, 2008) (if the facts pled in the complaint would be

sufficient to establish forfeitability, motion to dismiss must be denied; court is not free to accept

Claimant's explanation of the facts at the pleading stage).  Finally, inability to trace the

---

[1] For the purposes of Rule G(2)(f), the "complaint" includes the incorporated affidavit of a law
enforcement officer.  *See United States v. $448,163.10 in U.S. Currency*, 2007 WL 4178508, at
*4-5 (D. Conn. Nov. 20, 2007) (in determining the sufficiency of the complaint under the
Supplemental Rules, the court may take into account information contained in an affidavit filed
along with the complaint); *United States v. 2121 Kirby Drive*, 2007 WL 3378353, at *3 n.1
(S.D. Tex. Nov. 13, 2007) (in determining the sufficiency of a complaint, the court will look not
only to the complaint itself, but to any affidavit or other attachment to it).

Defendant Property to the underlying offense is not a basis for a motion to dismiss.  *See United States v. $40,960.00 in U.S. Currency,* 831 F. Supp. 2d 968, 971 (N.D. Tex. 2011).

C.      **Analogue Act**

The government contends that the Defendant Property is subject to forfeiture because it constitutes proceeds of or facilitated the distribution of the substances AM-2201, MAM-2201, and UR-144.  The Claimant furthermore knew that these substances were analogues of a Schedule I controlled substance, JWH-018.

The Controlled Substances Analogue Enforcement Act ("Analogue Act"), which amended the Controlled Substances Act, provides that a substance, although not scheduled as a controlled substance, may be regarded as one if it meets the definition of a "controlled substance analogue" and is intended for human consumption.  21 U.S.C. § 813 ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in Schedule I.").   A controlled substance analogue is defined using a three-prong test, and in the Fourth Circuit, to be an analogue, a substance must meet the first prong and either the second or third prong.  Thus under the three-prong test a Controlled Substance Analogue is a substance:

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; [and either]
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A); *see United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (to

establish that a substance is an analogue, the government must prove a substantial chemical

similarity to a controlled dangerous substance and either a similar effect as a controlled

dangerous substance or that the defendant represented the substance to have similar effects as a

controlled dangerous substance).

The Analogue Act also imposes a scienter requirement: an individual must know that the

substance at issue meets the definition of a controlled substance analogue set forth in § 802(32).

Specifically, "a defendant must know that the substance at issue has a chemical structure

substantially similar to that of a controlled substance, and he or she must either know that it has

similar physiological effects or intend or represent that it has such effects." *United States v.*

*Turcotte*, 405 F.3d 515, 527 (7th Cir. 2005).  But because proving a defendant's awareness of

such a chemical similarity may be "nettlesome . . . if the scienter requirement is met with regard

to the second part of the analogue definition (knowledge or representation of similar

physiological effects), the jury is permitted – but not required – to infer that the defendant also

had knowledge of the relevant chemical similarities." *Id.*  Thus, to violate the Analogue Act, an

individual does not need to be a chemist, nor does there need to be evidence that he or she

examined chemistry literature – if the individual knows that the substance has narcotic-like

effects when consumed or represents that the substance has such an effect, a jury can infer

knowledge of the chemical similarity.

The purpose of the Analogue Act is simple.  It seeks to hold accountable those who

attempt to skirt the controlled substances laws by slightly altering a controlled substance without

altering its narcotic effects and dangerousness.  *See Klecker*, 348 F.3d at 70.  In the First

Amended Complaint, the government alleges that this is precisely what the claimant has

attempted to do.

IV.    **ARGUMENT**

   A.    **Every Court to Address the Issue Has Ruled that the Analogue Act is Constitutional, Including a Court in a Case Involving XLR-11 and UR-144**

Every Circuit that has addressed the constitutionality of the Analogue Act, including the

Fourth Circuit, has found it constitutional.  Additionally, district courts in the Middle District of

Florida and the Western District of Louisiana found that the statute was constitutional in

prosecutions involving UR-144 and AM-2201, respectively.  Claimant asks the Court to reject all

of those cases.  The Court should not do so.

In *United States v. Klecker*, the Fourth Circuit affirmed the constitutionality of the

Analogue Act.  348 F.3d 69, 71-72 (4th Cir. 2003).  The panel in that case addressed the same

arguments put forward by the Claimant – that the statute doesn't provide adequate notice of the

nature of the prohibited conduct because whether the substance in question is substantially

similar may be the subject to conflicting expert testimony. *Compare Klecker*, 348 F.3d at 72 *with*

Claimant's Mot. to Dismiss at 7-9.  The *Klecker* Court determined that the Analogue Act was not

unconstitutionally vague with respect to the substances at issue in that case, and "would not be

unconstitutionally vague . . . *even with respect to a defendant who lacked notice*" that the

substance was an analogue.  *Klecker* 348 F.3d at 72.  Every other Circuit to address the

constitutionality of the Analogue Act has also found it to be constitutional.[5]

_____

[5] *See United States v. Orchard*, 332 F.3d 1133, 1137-38 (8th Cir. 2003); *United States v. Washam,* 312 F.3d 926, 930-32 (8th Cir. 2002); *United States v. Fisher,* 289 F.3d 1329, 1333-39 (11th Cir.2002); *United States v. Carlson,* 87 F.3d 440, 443-44 (11th Cir. 1996); *United States v. McKinney,* 79 F.3d 105, 108 (8th Cir.1996), *vacated on other grounds,* 520 U.S. 1226, 117 S.Ct. 1816, 137 L.Ed.2d 1025 (1997); *United States v. Hofstatter,* 8 F.3d 316, 321-22 (6th Cir.1993); *United States v. Granberry,* 916 F.2d 1008, 1010 (5th Cir. 1990); *United States v. Desurra,* 865 F.2d 651, 653 (5th Cir. 1989).  Claimant cites the lone case to accept a constitutional challenge

Although *Klecker* and the other Circuit court opinions cited above did not address any of the substances involved in the present case, two recent district court opinions addressed the issue – one case with respect to UR-144 and another substance called XLR-11 and another case with respect to AM-2201 – and held that the statute was constitutional as applied.[6] The first case, a district court opinion from the Middle District of Florida, ruled after an evidentiary hearing addressing a motion to dismiss an indictment that the Analogue Act was not unconstitutional as applied to UR-144 and XLR-11. *United States v. Fedida*, 2013 WL 1831991, at *3-8 (M.D. Fla. May 1, 2013).[7] As stated above, UR-144 is one of the substances involved in the present case. In the second case, *United States v. Reece*, in ruling on a motion to dismiss an indictment, a district court in the Western District of Louisiana adopted a magistrate judge's report and recommendation finding that the Analogue Act was not unconstitutionally vague when applied to AM-2201. 2013 WL 3865067, at 5-18 (W.D. La., July 24, 2013).  The Court should follow all of

---

to the Analogue Act, *United States v. Forbes,* a district court opinion from Colorado.  806 F.Supp.232, 237 (D. Colo. 1992).  That case, which is not controlling on this Court, was not even cited by *Klecker* nor the district court opinion in *Fedida* that upheld the constitutionality of the Analogue Act as applied to UR-144 and XLR-11, and involved testimony in which the government's own witnesses differed as to whether the substances involved were substantially similar to a controlled dangerous substance. *See Forbes,* 806 F. Supp., at 237-38.

[6] Another claimant in a case involving UR-144 and XLR-11 made constitutional challenges that appear to be nearly identical – almost *verbatim* – to the arguments of the Claimant in the present case. *Compare* Claimant's Mot. to Dismiss, (Doc. No. 22) at 7-10 *with United States v. Approximately $50,205.00 in United States Currency, et al.*, Claimant's Mot. to Dismiss, 12-cv-1183-JPS, Doc. No. 120 at 8-12 (E.D. Wis. 2013) (attached hereto as Exhibit 1).  But the district court in that case found that such arguments, based on facts outside the complaint that allegedly revealed a disagreement as to whether those substances are substantially similar in structure to scheduled narcotics, was not appropriate to consider on a motion to dismiss. *United States v. Approximately $50,205.00 in United States Currency, et al.*, 2013 WL 3729573, at *7 (E.D. Wis. July 12, 2013).  This is another reason why the Court should reject the Claimant's constitutional challenges.

[7] In its first motion to dismiss, prior to the Court's decision the *Fedida* and *Hummel* cases, the Claimant cited briefing and hearing transcripts from those cases heavily.

these cases and reject the Claimant's argument that the Analogue Act is unconstitutional as applied in this case.

> B.      **Whether UR-144, AM-2201, and MAM-2201 are Chemically Similar to JWH-018 is a Factual Issue that is Not Appropriate to Consider at the Motion to Dismiss Stage**

The government has alleged, based on analyses of DEA chemists, that UR-144, AM-2201, and MAM-2201 are substantially similar in chemical structure to JWH-018, a Schedule I controlled dangerous substance. *See* Adams Decl. ¶¶ 8 (UR-144) 16, 22-23, 27 (AM-2201); 46 (MAM-2201; UR-144).   Rather than addressing whether the government has alleged facts sufficient to establish a reasonable belief that the government would establish the substantial similarity between the these substances and JWH-018, Claimant devotes much of its motion to its expert's opinions, and another district court's findings of fact after an evidentiary hearing involving similar expert opinions.  In addressing a similar set of arguments that XLR-11 and UR-144 were not substantially similar in chemical structure, a district court in the Eastern District of Wisconsin held that such an argument "reveals only countervailing evidence regarding the issues of similarity of chemical structure and similarity of physiological effect on the central nervous system . . . [s]uch evidence, extrinsic to the complaint, is not a proper subject of a motion to dismiss a civil forfeiture complaint because it challenges the sufficiency of *the evidence* underlying the allegations in the complaint rather than the sufficiency of *the allegations in the complaint themselves*." *United States v. Approximately $50,205.00 in United States Currency, et al.*, 2013 WL 3729573, at *7 (E.D. Wis. July 12, 2013) (emphasis in original).[8]  Unlike *$50,205.00*, the case Claimant relies on, *The Smoke Shop LLC v. DEA*, was a factual finding after an evidentiary hearing.  2013 WL 2632575, at *1-2 (E.D. Wis., May 21, 2013).  Accordingly,

---

[8] In the criminal context, the court in *United States v. Reece*, cited above, found that whether AM-2201 was a controlled substance analogue is a factual issue that must be determined at trial. 2013 WL 3865067, at *5 (W.D. La., July 24, 2013).

while the government will ultimately be able to prove its case after expert discovery, the issue is

premature at this time.

> C.   **The Amended Complaint Sufficiently Alleges Facts with Particularity that if Proven Would Establish *Mens Rea***

The First Amended Complaint alleges facts sufficient to satisfy its burden as to the

scienter element of the Analogue Statute.   The Complaint describes both direct and

circumstantial evidence that the Claimant knew that its products were intended for human

consumption.  As stated above, under the *Turcotte* case, such evidence is not only sufficient to

establish knowledge that the substances have a narcotic-like effect (the second statutory prong),

but the jury can also infer from that evidence the Claimant's knowledge of the substantial

chemical similarity between the substances he is distributing and a scheduled controlled

dangerous substance (the first statutory prong).

In terms of direct evidence, as stated above, a confidential source overheard Bowles and

other employees of the Claimant discussing that Claimant's products were "smoked" and that it

made the consumers of the products "high."  Adams Decl. ¶ 69.[9]  This alone is sufficient to show

that the Claimant intended its products for human consumption and that those products had

narcotic-like effects.

The First Amended Complaint also lays out substantial circumstantial evidence of the

Claimant's knowledge.  First, the declarant explains that while the Claimant's products purport

to be "potpourri," there is no reason to add chemicals such as UR-144, AM-2201, or MAM-2201

to such products.  Adams Decl. ¶ 66-67.  The only purpose of adding those substances is to give

---

[9]  The Claimant is a company, and as such under the "collective knowledge" doctrine, it is deemed to have the aggregate of all the knowledge that its individual employees obtained within the scope of their employment, and one individual employee need not have all the requisite scienter to be guilty of a crime if the employees have that knowledge collectively.  *United States v. Bank of New England*, 821 F.2d 844, 855-56 (1st. Cir. 1987).

the products narcotic-like effects. *Id.* And the Claimant knew specifically that those substances were added to its product, as evidenced by the fact that Bowles mentioned UR-144 by name when the search warrant was executed on the Claimant's property on July 25, 2012. *Id.* ¶ 68. Furthermore, there is even less reason to change from one such substance to another; the only reason for such a change is to stay ahead of the controlled substance scheduling process and government enforcement. *Id.* ¶¶ 66-67. Finally, the retail stores which sold the Claimant's products charged $20 a gram, a hefty price for "potpourri." *Id* ¶ 14.

Additional circumstantial evidence shows the Claimant's attempts to give the appearance of compliance with the law, while it was in fact distributing analogue substances fully intending them to be consumed as narcotics. The First Amended Complaint describes evidence that the Claimant provided its customers a list of the illicit substances its products did not contain, while not describing the substances it did contain. Adams Decl. ¶ 70. Bowles also told another employee of the Claimant not to use the terms "smoke" or "flavor," to avoid the appearance that they were selling products intended to be smoked. *Id.* ¶ 72. Finally, while on the phone during an undercover call, Bowles was careful to mention once that his products were not intended to be consumed, but didn't repeat that comment lest the caller lose interest in Bowles' products, which had no other worth than as narcotics. *Id.* ¶ 41. These facts all reflect the Claimant's attempts to evade application of the drug laws by sleight of hand while distributing the functional equivalent of scheduled controlled substances – precisely the conduct the Analogue Act was designed to combat.

The Claimant argues that there is no evidence it knew its products contained substances that were substantially similar in chemical structure (the first statutory prong). Under the *Turcotte*, case, however, a jury can infer that the Claimant knew that the substances he was

distributing were substantially similar in chemical structure to a scheduled controlled substance

with evidence that the Claimant knew of the narcotic-like effects of the substances he was selling

(the second statutory prong). *United States v. Turcotte*, 405 F.3d 515, 527 (7th Cir. 2005). The

ample evidence described above shows that the Claimant knew his products were being

consumed and that it had narcotic-like effects, and thus it is sufficient to satisfy the government's

burden.

        D.      **The Government Need Not Trace the Defendant Property to the Underlying Offenses at this Stage, but at Trial the Government will Prove that all of the Claimant's Income was Derived from Analogue Sales as Alleged in the Complaint**

      The Claimant's final argument is that the government has failed to trace the Defendant

Property to the sales of analogue products.  As stated above, this is not a proper basis for a

motion to dismiss a forfeiture complaint. *United States v. $40,960.00 in U.S. Currency,* 831 F.

Supp. 2d 968, 971 (N.D. Tex. 2011).   In the case of *United States v. $40,960.00,* a civil

forfeiture complaint was filed against a sum of money allegedly involved in violations of

prohibitions against structuring currency transactions with the intent to avoid reporting

requirements. *Id.* at 969.  The claimants in that case moved to dismiss the complaint for failure to

allege that the defendant property was the same money that was involved in the allegedly

structured transactions.  *Id.* at 971. The Court rejected that argument, stating "the insufficiency of

any tracing of funds to the offense cannot be a basis for dismissal of a forfeiture complaint."  *Id.*

The same is true in the present case – an alleged failure to trace the Defendant Property to the

underlying offenses is not a proper basis to dismiss a complaint.

      Although the government need not trace the Defendant Property to the underlying

offenses at the motion to dismiss stage, the facts alleged in the First Amended Complaint will do

so when they are proven at trial. The First Amended Complaint alleges that *all* of the Claimant's

sales, and thus the Defendant Property, involved products containing UR-144, AM-2201, and MAM-2201 and violated the Analogue Act. *See* Adams Decl. ¶¶ 80-86.[10]  The First Amended Complaint alleges several facts that establish this.  First, thousands of pounds of substances containing UR-144 and MAM-2201 were seized from the Claimant's location.  Adams Decl. ¶¶ 53-56.[11]  Second, the portion of the Defendant Property consisting of checks and money orders were found in proximity to analogue products. *Id.* ¶¶ 53-57, 59, 61-62, 65.[12]  Finally, the Defendant Property constituted of funds that retail stores selling tobacco products, much like the two stores at which the government conducted the undercover purchases of analogue products, sent to the Claimant. *Id.* ¶¶ 80-83.

---

[10]  The Claimant, without any case law support, claims that the government must show which portion of the funds related to sales of AM-2201 and MAM-2201, and which related to sales of UR-144.  Again, such tracing is not necessary at this phase of the litigation. *Cf. United States v. Two Parcels in Russell County*, 92 F.3d 1123, 1127 (11th Cir. 1996) (when probable cause is based on evidence that the participants are generally engaged in the drug business, have no other source of income, and bought the properties with drug proceeds, it is not necessary to identify specific drug transactions in the complaint).

[11]  The Claimant argues that funds derived from sales made prior to March 1, 2011, when JWH-018 became a controlled substance, cannot be subject to forfeiture.  This argument fails.  With respect to the checks and money orders, those items were seized in July and August 2012, and could not have reflected sales from before March of 2011.  With respect to the funds seized from the bank account, the government is entitled to take advantage of the "first in, first out" accounting principal. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986).  Thus because the complaint alleges that since March 1, 2011, well over the $2,200,000 that was seized was deposited into the bank account from which the property was seized, the Claimant's argument is unavailing. *See* Adams Decl. ¶ 79 ($324,522.00 deposited into the account on a single day, July 16, 2011).

[12] Although not in the First Amended Complaint, the government can represent that the only non-analogue products found during the July 2012 search warrant were approximately a hundred packets of pills, that Bowles said he had started to sell, but were not yet on any of Claimant's brochures.

V.      **CONCLUSION**

For the reasons stated above, the Court should DENY the Claimant's motion to dismiss

the First Amended Complaint.  If for any reason the Court denies the Claimant's motion to

dismiss, the government asks leave to amend its complaint.


                                          Respectfully submitted,

                                          Rod J. Rosenstein
                                          United States Attorney


August 5, 2013                            /s/
Date                                      Evan T. Shea
                                          Assistant United States Attorney
                                          36 S. Charles Street
                                          Fourth floor
                                          Baltimore, Maryland 21201
                                          Telephone (410) 209-4800

CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that this Response to Claimant's Motion to Dismiss was filed

using CM/ECF on August 5, 2013 and served on all parties electronically via that system.


/s/_____

Evan T. Shea

Assistant United States Attorney

36 South Charles Street

Fourth Floor

Baltimore, MD 21201

410-209-4982