IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>$2,200,000 IN U.S. CURRENCY<br>AND 34 MONEY ORDERS AND 102<br>CHECKS WRITTEN TO M&C<br>WHOLESALE AND DANIEL<br>BOWLES,<br><br>    *Defendant*. | Civil Action No. ELH-12-3501 |

## MEMORANDUM OPINION

This is a civil forfeiture action brought by the United States (the "Government"), plaintiff, pursuant to 21 U.S.C. § 881(a)(6). Claimant is M&C Wholesale LLC ("M&C" or "Claimant"), a California limited liability company. The property at issue (collectively, the "Defendant Property") consists of the following: (1) $2,200,000 in U.S. currency, seized on or about July 25, 2012, from Wells Fargo bank account number XXXXXXX3269 ("Account 3269"); (2) 20 checks and 14 money orders seized on July 25, 2012, from 27324 Camino Capistrano, Laguna Niguel, California; (3) 51 checks and 14 money orders seized on July 25, 2012, from 33762 Avenida Calita, San Juan Capistrano, California; and (4) 31 checks and 6 money orders seized on July 27, 2012, and August 1, 2012, from Federal Express packages addressed to M&C and its employee, Daniel Bowles ("Bowles"). *See* ECF 18-1 at 1.

On April 25, 2013, the Government filed a First Amended Verified Complaint for Forfeiture (ECF 18, the "Amended Complaint"), supported by the Declaration of Thomas Adams, Special Agent of the Drug Enforcement Administration ("Adams Declaration" or

"Adams Decl.").[1]  In its suit, the Government alleges that the Defendant Property was derived from the distribution of certain products alleged to be controlled dangerous substance analogues. As explained, *infra*, under the Controlled Substance Analogue Enforcement Act of 1986 ("Analogue Act"), codified at 21 U.S.C. §§ 802(32)(A), 813, certain substances similar to illegal drugs in their chemical structure and physiological effect may be treated, for purposes of federal law, as controlled substances.

Lodging a variety of challenges to the Amended Complaint, Claimant has filed a Motion to Dismiss Amended Complaint and Alternative Motion for More Definite Statement (ECF 22, the "Motion" or "Mot."), pursuant to Fed. R. Civ. P. 12(b)(6) and the Fifth Amendment's Due Process Clause.  Mot. at 1.  The Government opposes the Motion (ECF 25).[2]  No hearing is necessary to resolve the matter.  *See* Local Rule 105.6.  With one exception, Claimant's contentions lack merit.  Accordingly, for the reasons set forth below, I will grant the Motion, with leave to amend.

## I.  Factual Background

The factual allegations are drawn largely from the Adams Declaration, attached to the Amended Complaint and incorporated by reference.  *See* Amended Complaint ¶ 8; ECF 18-1.[3]

---

[1] Previously, on November 28, 2012, the Government filed a Verified Complaint for Forfeiture (ECF 1, "Complaint").  M&C moved to dismiss the original Complaint on April 8, 2013.  *See* ECF 9.  The Government did not oppose the motion.  Instead, it filed the Amended Complaint.  *See* ECF 18.

[2] The Court has reviewed Claimant's Motion; the Government's opposition (ECF 25, "Opposition" or "Opp."); and Claimant's reply (ECF 26, "Reply").  The parties also submitted supplemental filings addressing whether *United States v. Fedida*, 942 F. Supp. 2d (M.D. Fla. 2013), which the Government cited in its Opposition, remained good law.  *See* ECF 27 (Claimant's filing) and ECF 28 (Government's response).  However, *Fedida* is at most persuasive authority, and because I decline at this stage to resolve the issues to which *Fedida* may be relevant, *see infra*, it is unnecessary to determine the status of *Fedida* at this time.

[3] In resolving Claimant's Motion, the allegations contained in the Amended Complaint are taken as true.  In connection with a motion to dismiss pursuant to Fed. R. Civ. P. 12, a court

JWH-018 became a Schedule I controlled dangerous substance on March 1, 2011. Adams Decl. ¶ 7 (citing 21 C.F.R. § 1308.11(g)(8)); *see* 76 Fed. Reg. 11075-01, 2011 WL 685945 (Mar. 1, 2011) (reflecting addition of JWH-018 as a Schedule I controlled substance). This case involves three substances that are all alleged to be analogues of JWH-018: UR-144, AM2201,[4] and MAM-2201. Adams Decl. ¶¶ 8, 16, 22-23, 27 (UR-144 and AM2201 alleged to have a substantially similar chemical structure as JWH-018 and to produce a similar effect as JWH-018 when consumed); ¶¶ 46, 56 (MAM-2201 alleged to be an analogue of JWH-018).[5]

According to the Government, funds linked to the sale of UR-144, AM2201, and MAM-2201 are subject to forfeiture. It asserts that the Defendant Property includes "funds seized from

---

may consider exhibits attached to the complaint, as well as documents incorporated by reference therein. *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013); *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (when addressing motion to dismiss, court may consider "documents incorporated into the complaint by reference"); *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (in resolving motion to dismiss, court may consider documents "attached to the complaint") (citing Fed. R. Civ. P. 10(c)). Courts have applied that principle to affidavits attached to complaints in civil forfeiture matters. *See, e.g.*, *United States v. $448,163.10 in U.S. Currency*, 2007 WL 4178508, at *4-5 (D. Conn. Nov. 20, 2007) (court may consider information found in affidavit filed with forfeiture complaint when determining sufficiency of complaint); *United States v. 2121 Kirby Drive, Unit 33, Houston, TX.*, 2007 WL 3378353, at *3 n.1 (S.D. Tex. Nov. 13, 2007) (same).

[4] Although the parties often use the term "AM-2201," other sources indicate that the proper shorthand for the substance is "AM2201." *See, e.g.*, Pub. L. No. 112–144, 126 Stat. 993 (July 9, 2012). Unless quoting other sources, I will use the latter designation.

[5] In July 2012, Congress enacted the Synthetic Drug Abuse Prevention Act of 2012 (the "SDAPA"), which made AM2201 a Schedule I controlled dangerous substance. *See* Pub. L. No. 112–144, 126 Stat. 993 (July 9, 2012); *see also* Adams Decl. ¶ 9. Several courts have concluded that the SDAPA became effective on July 9, 2012. *See, e.g.*, *Riley*, 2014 WL 537013, at *4; *Carlson*, 2013 WL 5125434, at *21. Nevertheless, because the relevant time period in this case almost entirely predates July 2012, the Government's claim regarding the illegality of AM2201 is premised on its status as an analogue of JWH-018. The same is true of UR-144, which became a Schedule I controlled substance pursuant to a final administrative order dated May 16, 2013. *See* 78 Fed. Reg. 28735-01, 2013 WL 2060961 (May 16, 2013). That administrative order also added XLR11 (sometimes referred to as "XLR-11"), a substance that is not directly at issue in this case, but is referenced in the briefing and case law.

a bank account that was used as a repository for [the] payments" for the illegal substances, as well as "checks and money orders constituting the payments themselves" that were submitted by customers of Bowles and M&C. Adams Decl. at 2.

The Government alleges that Bowles and M&C manufactured controlled dangerous substance analogues in California and sold the products to "smoke shops" throughout the United States. Adams Decl. at 1. Bowles and M&C shipped their products to retail stores via the U.S. Mail and Federal Express, and the stores would submit payment to Bowles and M&C through checks or money orders sent in the same manner. *Id.* at 1-2. Although Bowles's position with M&C is not specified in the Amended Complaint, the suit indicates that he held a leading role at the company. *See, e.g.*, *id.* at 1 (stating that "BOWLES and M&C conducted an operation whereby they would manufacture controlled dangerous substance analogues . . ."); ¶¶ 26, 28 (invoices bore Bowles's name); ¶ 36 (package containing product was addressed from "Daniel BOWLES, M&C Wholesale"); and ¶¶ 72-73 (Bowles provided directions to marketing employee of M&C).

In September and November 2011, an undercover agent of the Drug Enforcement Administration ("DEA") made several undercover purchases from The Tobacco Stop, a retail business located in Harford County, Maryland. *See* Adams Decl. ¶¶ 10-27. A DEA source had learned that The Tobacco Stop was selling a synthetic drug known as "Hysteria," which was labeled as "potpourri." *Id.* ¶ 11. An undercover DEA officer entered The Tobacco Stop on September 22, 2011, and asked whether "Hysteria" was available. *Id.* ¶ 13. An employee offered, for $20, a bag labeled "'1 gm HYSTERIA potpourri, 100% Marshmallow leaf not for human consumption.'" *Id.* ¶¶ 13-14 (quoting packaging). The undercover officer paid the

employee, who confirmed that, despite the labeling, the product was intended to be smoked. *Id.* ¶ 15. The purchased product was tested and found to contain AM2201. *Id.* ¶ 16.

On November 14, 2011, the undercover officer purchased three grams of "Hysteria" for $47 from the same employee, who also sold rolling papers to the officer, "commonly used to roll marijuana-type substances into cigarette form for consumption." Adams Decl. ¶¶ 17-19. The employee advised the officer to be careful while using the rolling papers because "Hysteria" is "'very strong.'" *Id.* ¶ 20 (quoting employee).

The DEA executed a search warrant at The Tobacco Stop in December 2011. At that time, it seized approximately 400 packages labeled "Hysteria," approximately 30 packages labeled "Game Over," and approximately 17 packages labeled "Black Sabbath," as well as similar products. Subsequent chemical analysis of the seized packages labeled "Hysteria," "Game Over," and "Black Sabbath" showed that they contained AM2201. Adams Decl. ¶¶ 25, 27. Also found during the execution of the search warrant were sales invoices from Daniel Bowles, reflecting shipments of those three substances to The Tobacco Stop. *Id.* ¶ 26. Employees of The Tobacco Stop were interviewed and indicated that their practice was to pay M&C by check whenever they received an order. *Id.* ¶ 76.[6]

On April 3, 2012, the Government, through a confidential source, placed a telephone call to the number contained on the sales invoices from Bowles found at The Tobacco Stop. An individual who identified himself as "Dan" answered the call. Bowles agreed to send a "sample package" of his products and told the source that, at that time, he carried four products: "Brain Freeze," "Black Sabbath," "Game Over," and "Dr. Feelgood." *Id.* ¶¶ 28-29. Further, Bowles indicated that he no longer sold "Hysteria," and noted that "Brain Freeze" was his "best seller." *Id.* ¶ 29. Bowles then shipped samples, all labeled with one of those four names, to the source

---

[6] The Amended Complaint does not specify when the employees were interviewed.

via the Dragon's Den Smoke House in Baltimore, Maryland. The package contained an invoice on M&C letterhead and was addressed from "Daniel Bowles, M&C Wholesale," at 27324 Camino Capistrano, Suite 155, Laguna Niguel, California, 92677. *Id.* ¶¶ 30-36. The samples were later tested and found to contain UR-144. *Id.* ¶ 37.

Thereafter, on June 18, 2012, the confidential source placed another call to the same telephone number and spoke again with an individual who identified himself as "Dan." Adams Decl. ¶¶ 38-39. Although the source asked three times which products were strongest when smoked, only once did "Dan" respond that the products were not intended for smoking. Nor did "Dan" explain that they instead were meant to be used as potpourri. *Id.* ¶¶ 41, 43. During the call, the source ordered 50 packages of "Brain Freeze," which were shipped from "International Wholesale," located at the same address used by M&C. *Id.* ¶¶ 40-45. The "Brain Freeze" product was later tested and found to contain UR-144 and MAM-2201. *Id.* ¶ 46.

The Government also obtained information from a courier service employee who had made deliveries to and picked up items from M&C's location in Laguna Niguel, California. Adams Decl. ¶ 47-48.[7] In particular, the courier had been inside one of M&C's suites and "observed 8-10 individuals seated around a table handling piles of a green herb-like substance. No other activity appeared to be ongoing within the suite." *Id.* ¶ 49. An individual who appeared to be an M&C employee told the courier that their business involved selling products wholesale to "smoke shops." *Id.* ¶ 50. In his Declaration, Adams avers that analogue products "typically use vegetable or herb substances as a base with which an analogue substance is then combined. Once combined, the analogue and herb/vegetable substances are then typically

_____

[7] In the context of these allegations, the Adams Declaration twice provides an address of "27234 Camino Capistrano." Adams Decl. ¶¶ 48-49. It appears that address contains a typographical transposition of two numbers, as other references to M&C's location refer to "27324 Camino Capistrano." *See, e.g.*, Amended Complaint ¶ 2; Adams Decl. at 1; ¶¶ 36, 45, 52, 57, 63, 83, 87; and Attachment A.

packaged in small heat-sealed bags for retail sale, and once purchased from a 'smoke shop' the contents are then smoked." *Id.* ¶ 51.

The Amended Complaint also includes allegations concerning the payment for M&C's products. Generally, M&C would send cash-on-delivery shipments to retailers who had placed orders with M&C sales personnel. Adams Decl. ¶ 83. Upon delivery, the purchaser would send a bank check or money order payable to Bowles or M&C at 27324 Camino Capistrano, Laguna Niguel, California. *Id.* As noted, employees of The Tobacco Stop told federal agents that whenever an order from M&C was received, The Tobacco Stop would send its payment by check. According to bank records, between November 2010 and December 2011, "various checks from The Tobacco Stop worth $66,117.50 [and] made payable to M&C Wholesale and/or Daniel Bowles were deposited in Wells Fargo Bank account XXXXXX0553." *Id.* ¶¶ 76-77. That account ("Account 0553") was opened in M&C's name, with Bowles and his sister-in-law, Chelsea Bowles, as the account's signatories. *Id.* ¶ 78. Notably, on one day alone, July 16, 2011, a total of $324,522.00 was deposited into Account 0553. *See id.* ¶ 78, ¶ 79. Bank records indicate that most deposits into the account originated from businesses with names such as "D & A Smoke Shop," "Puff N Snuff," "Hawaiian Holy Smoke," "190 Drive-Thru Smoke Shop," "North Shore Smoke Shop," "Happy Daze," "Up in Smoke," and "Sky High Smoking Accessories." *Id.* ¶ 80.[8]

On July 25, 2012, the Government executed three search warrants issued by the United States District Court for the Central District of California at M&C's place of business: Suites 155, 156, and 172, 27324 Camino Capistrano, Laguna Niguel, California. Among the items seized were several thousand pounds of the suspected analogue "Spice"; "several kilograms of

---

[8] The checks and money orders seized by the Government in July and August 2012 included some from ambiguously-named businesses that the Government confirmed through internet searches were in fact "smoke shops." Adams Decl. ¶¶ 81-82.

the suspected pure chemicals that make up the suspected analogue products"; "several thousand pre-packaged bags of suspected analogue with various brand names that included Brain Freeze, Dr. Feelgood, Black Sabbath, Game Over, and Hysteria," located throughout three suites occupied by M&C; and 20 checks and 14 money orders payable to Bowles or M&C. Adams Decl. ¶¶ 52-57 and Attachment A (listing checks and money orders seized at that location).

That same day, the Government performed a search of Bowles's residence, located at 33762 Avenida Calita, San Juan Capistrano, California. The search was conducted with the consent of both Bowles and his girlfriend. Adams Decl. ¶¶ 58-60. Among other items, the Government seized additional checks and money orders payable to Bowles or M&C. *Id.* ¶ 61 and Attachment B (listing checks and money orders seized). Later, on July 27, 2012, and again on August 1, 2012, the Government seized additional packages addressed to M&C, which were found to contain products as well as checks and money orders payable to Bowles or M&C. *Id.* ¶¶ 63-65 and Attachment C (listing checks and money orders seized).[9]

On or about July 25, 2012, pursuant to a "seizure warrant" issued by the United States District Court for the District of Maryland, the Government seized $2,200,000 from Account 3269. Adams Decl. ¶ 84.[10] Notably, the Amended Complaint does not identify the owner or signatory of Account 3269.

_____

[9] The Adams Declaration is ambiguous as to the location of those seizures. It states: "On July 27, 2012 and August 1, 2012 law enforcement officers identified Federal Express packages addressed to M&C Wholesale at 27324 Camino Capistrano, Laguna Niguel, CA 92677." *Id.* ¶ 63. It is not entirely clear, however, whether the seizure occurred there, or whether the packages were merely addressed to that location. Attachment C does contain a heading of "From HIS Orange County," but provides no further information as to the location of the seizure. The Adams Declaration further explains that, "[b]ased on information obtained from the July 25, 2012 search warrant, Homeland Security Investigation Special Agent Tamara Sopka obtained a Federal Search warrant to open the packages." *Id.* ¶ 64.

[10] Although the Amended Complaint generally refers to July 25, 2012, as the date on which the $2,200,000 in U.S. currency was seized, *see, e.g.*, Amended Complaint ¶ 2, Adams

According to the Government, its allegations "demonstrate that [Account] XXXXXXX3269 was a repository for money paid to purchase illegal narcotics sold by Daniel BOWLES and M&C Wholesale." *Id.* ¶ 85. Moreover, it claims that the checks and money orders listed in Attachments A, B, and C to the Adams Declaration "were intended to be used to purchase illegal narcotics from Daniel BOWLES and M&C Wholesale and represent proceeds from those sales." *Id.* ¶ 86.

Additional facts are included in the Discussion.

## II. Discussion

A. Civil forfeiture actions

A civil forfeiture action is governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202 (codified in part at 18 U.S.C. § 983).[11] In a forfeiture action, the Government must "state[] the circumstances giving rise to the forfeiture claim with sufficient particularity" to allow a claimant to conduct a "meaningful investigation of the facts and draft[] a responsive pleading." *United States v. Mondragon*, 313 F.3d 862, 866 (4th Cir. 2002). Where the Government's theory holds that "the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense," the Government must "establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3); *see United States v. Borromeo*, 995 F.2d 23, 25 (4th Cir. 1993); *United States v. $95,945.18 in U.S. Currency*, 913 F.2d 1106, 1110 (4th Cir. 1990); *United States v. Santoro*, 866 F.2d 1538, 1542 (4th Cir. 1989); *United States v.*

---

Decl. at 1 and ¶ 87, in one instance it cites July 26, 2012. Adams Decl. ¶ 84. Except where quoted text specifies a particular date, I will generally refer to the seizure of U.S. currency as having occurred "on or about July 25, 2012."

[11] A separate provision, 21 U.S.C. § 853, governs criminal forfeitures. *See generally Kaley v. United States*, --- U.S. ----, 134 S. Ct. 1090, 1094-95 (2014).

*$40,041.20 In U.S. Currency Seized From State Dept. Federal Credit Union Account No. XXX786*, 2012 WL 5409753, at *5 (D. Md. Nov. 5, 2012) (Chasanow, J.).

Among the categories of property subject to forfeiture are the following, *see* 21 U.S.C. § 881(a)(6):

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

Under CAFRA, the Government ultimately must prove, "by a preponderance of the evidence, that the property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(1). "The government may rely on circumstantial evidence to establish forfeitability." *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010). A determination as to whether the Government has met its burden is based on "the totality of the circumstances." *United States v. $864,400.00 in U.S. Currency*, 2009 WL 2171249, at *2 (M.D.N.C. July 20, 2009), *aff'd*, 405 F. App'x 717 (4th Cir. 2010).

Of import here, "the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(2). Moreover, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." *Id.* § 983(a)(3)(D). As such, "the Government's forfeiture claim can advance forward in the face of a . . . motion to dismiss even if the Government's complaint does not provide all the facts that would allow the Government to ultimately succeed in the forfeiture proceeding." *United States v. 630 Ardmore Drive*, 178 F. Supp. 2d 572, 581 (M.D.N.C. 2001).

The Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules" or "Supp. R.") apply to a civil forfeiture action. *United States v. $ 74,500 in U.S. Currency*, 2011 WL 2712604, at *2 (D. Md. July 11, 2011); *accord U.S. v. $15,860 in U.S. Currency*, --- F. Supp. 2d ----, 2013 WL 4516138, at *1 (D. Md. Aug. 26, 2013); *United States v. $85,000 in U.S. Currency*, 2011 WL 1063295, at *1 (D. Md. Mar. 21, 2011). In the event of an inconsistency, the Supplemental Rules will trump the Federal Rules of Civil Procedure. Supp. R. A(2); *see $85,000 in U.S. Currency*, 2011 WL 1063295, at *1.

In *United States v. $ 74,500 in U.S. Currency*, 2011 WL 2712604, at *2, the court set forth the standards applicable to a motion to dismiss in the context of an *in rem* forfeiture action:

> The pleading standard for civil forfeiture actions was initially promulgated in the case of *United States v. Mondragon*, which held that a Complaint "must allege sufficient facts to support a reasonable belief that the property is subject to forfeiture." [313 F.3d at 865]. The *Mondragon* Court interpreted the pleading standard in prior Supp. R. E(2)(a), which was superseded by the 2006 enactment of Supp. R. G(2). *See United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008) (noting that Supp. R. G(2)(f) supplanted Supp. R. E(2), but adopted the *Mondragon* standard for determining the sufficiency of a complaint).

> A Motion to Dismiss made pursuant to Supp. R. G(8)(b) is governed by Supp. R. G(2), which provides in pertinent part, that the Complaint shall "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). Although the pleading standard under Supp. R. G(8)(b) is higher than the standard for Fed. R. Civ. P. 8(a), the pleading requirements are nonetheless satisfied if the Government pleads enough facts to support a "reasonable belief" that the Government will be able to meet its burden of proof at trial. *See United States v. Real Property Located at 5208 Los Franciscos Way*, 385 F.3d 1187, 1193 (9th Cir. 2004) (noting that the Government "is not required to prove its case simply to get in the courthouse door").

B.  The Analogue Act

"Congress enacted the Analogue Act to prevent underground chemists from altering illegal drugs in order to create new drugs that are similar to their precursors in effect but are not subject to the restrictions imposed on controlled substances."  *United States v. Klecker*, 348 F.3d 69, 70 (4th Cir. 2003) (citing *United States v. Hodge*, 321 F.3d 429, 432 (3d Cir. 2003)).  The Analogue Act provides: "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I."  21 U.S.C. § 813.  A "controlled substance analogue" is defined in 21 U.S.C. § 802(32)(A) as follows:

> Except as provided in subparagraph (C), the term "controlled substance analogue" means a substance—
>
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

The first prong has been read in the conjunctive with the two subsequent prongs.  As the Fourth Circuit has summarized in *Klecker*, to establish an Analogue Act violation the Government must prove, 348 F.3d at 71 (emphasis in original): (1) "substantial *chemical* similarity between the alleged analogue and a controlled substance," *see id.* § 802(32)(A)(i); (2) either "actual, intended, or claimed *physiological* similarity (in other words, that the alleged analogue has effects similar to those of a controlled substance." *See id.* § 802(32)(A)(ii), or "that

- 12 -

the defendant intended or represented that the substance would have such effects),” *see id.* § 802(32)(A)(iii); and (3) “*intent* that the substance be consumed by humans.” *See id.* § 813. *See also United States v. Turcotte*, 405 F.3d 515, 524 (7th Cir. 2005); *United States v. Roberts*, 363 F.3d 118, 121 (2d Cir. 2004); *Hodge*, 321 F.3d at 433.

Further, the Analogue Act has been read to impose a scienter requirement, such that “a defendant must know that the substance at issue has a chemical structure substantially similar to that of a controlled substance, and he or she must either know that it has similar physiological effects or intend or represent that it has such effects.” *Turcotte*, 405 F.3d at 527. Because proof that a defendant was aware of a chemical similarity will be “nettlesome,” in the event “the scienter requirement is met with regard to the second part of the analogue definition (knowledge or representation of similar physiological effects), the jury is permitted—but not required—to infer that the defendant also had knowledge of the relevant chemical similarities.” *Id.*

C. Contentions

In support of the Motion, Claimant argues that (a) the Amended Complaint should be dismissed for failure to state a claim, Mot. at 6; (b) the Analogue Act is unconstitutionally vague, *id.* at 7-10; (c) UR-144, AM2201, and MAM-2201 are not analogues of JWH-018, *id.* at 10-13; and (d) the Amended Complaint lacks sufficient particularity to trace the Defendant Property to illegal analogue sales. *Id.* at 13-17. The Government disputes Claimant’s contentions but, should the Court identify any pleading deficiencies, it requests leave to amend. *See* Opp. at 19.[12]

---

[12] The Opposition states: “For the reasons stated above, the Court should DENY the Claimant’s motion to dismiss the First Amended Complaint. If for any reason the Court *denies* the Claimant’s motion to dismiss, the [G]overnment asks leave to amend its complaint.” Opp. at 19 (emphasis added). I presume that the Government intended to request leave to amend in the event the Court *grants* Claimant’s Motion.

<u>1. Dismissal for failure to state a claim</u>

Claimant urges dismissal of the Amended Complaint for failure to state a claim, asserting that it does not allege that Claimant possessed the requisite *mens rea*. Mot. at 6. In particular, Claimant says, the Amended Complaint does not allege that M&C "knew that UR-144, AM-2201, or MAM-2201 was an analogue of JHW-018 or any other controlled substance." *Id.* According to the Government, however, the Amended Complaint "provides both direct and circumstantial evidence establishing that the Claimant knew that the substances it sold had narcotic-like effects, which under the law is also sufficient to establish that it knew those products were substantially similar in chemical makeup to scheduled controlled substances." Opp. at 2.[13]

As Claimant acknowledges, "[t]he Amended Complaint alleges that UR-144, AM-2201, and MAM-2201 have been found to have a substantially similar chemical structure as well as a substantially similar pharmacological effect as the Schedule I controlled substance JWH-018." Mot. at 6; *see* Adams Decl. ¶¶ 8, 16, 22-23, 27 (UR-144 and AM2201); ¶¶ 46, 56 (MAM-2201). However, Claimant maintains that the Amended Complaint does not specify "who made such findings, when they did so, or who could have had notice of such findings." Mot. at 6. Claimant cites no authority for the proposition that the Government must allege such details in a complaint.

_____

[13] The Government maintains that, under the "collective knowledge" doctrine, a company such as M&C is "deemed to have the aggregate of all the knowledge that its individual employees obtained within the scope of their employment, and one individual employee need not have all the requisite scienter to be guilty of a crime if the employees have that knowledge collectively." Opp. at 15 n.9 (citing *United States v. Bank of New England*, 821 F.2d 844, 855-56 (1st Cir. 1987)). Neither Claimant's Motion nor its Reply squarely raise any issue as to either the knowledge of individual M&C employees or the question of aggregation. In any event, even if aggregating the knowledge or intent of individual employees would be unwarranted in this context, the Government's allegations indicate that Bowles, who held some unspecified but nevertheless leading role at M&C, possessed the requisite *mens rea.*

Additionally, Claimant argues that "the Amended Complaint does not allege that Claimant knew that UR-144, AM-2201, or MAM-2201 was an analogue of JHW-018 or any other controlled substance." Mot. at 6. As noted, to meet its burden, the Government must show that a claimant knew an alleged analogue substance "has a chemical structure substantially similar to that of a controlled substance," and either knew that the substance "has similar physiological effects" or "intend[ed] or represent[ed] that it has such effects." *Turcotte*, 405 F.3d at 527. Where the Government can show a claimant was aware of a substance's "similar physiological effects" to an illegal drug, or made representations indicating as much, a jury may infer that a claimant was also aware of chemical similarities between the analogue and the substance classified as illegal. *See id.*

The Government points to information from a confidential source who "overheard conversations" in which Bowles and other M&C employees discussed (a) the fact that M&C's products were smoked, (b) "the chemical effects that the products had on the body," and (c) the fact "that they made users 'high.'" Adams Decl. ¶ 69. Further, in an interview with law enforcement on July 25, 2012, Bowles acknowledged that M&C's products contained UR-144, expressly referencing that substance by name. *Id.* ¶ 68. And, although M&C's awareness of such pricing is not alleged, a retail cost of $20 per gram appears excessive for actual potpourri that is not intended to be smoked. *See id.* ¶ 14.

Additionally, the Government's allegations reflect various efforts by Bowles and M&C to obscure both the contents and the intended use of its products. According to a confidential source, M&C provided its customers with "lab reports" that identified substances the products did *not* contain, but omitted certain substances—including analogues—that the products *did* contain. *Id.* ¶ 70. And, during a telephone conversation with a confidential source, Bowles

indicated only once that the products were not intended to be smoked, despite repeated questions from the source as to which products were the strongest. Moreover, he never told the source that the products were intended to be used merely as potpourri. *See id.* ¶¶ 38-43. In addition, the Government observes that the only reason for adding substances such as UR-144, AM2201, or MAM-2201 to purported "potpourri" is to produce a narcotic-like effect. *Id.* ¶¶ 66-67 (observing that "a legitimate manufacturer of 'potpourri' would have no reason to add" such chemicals to its product). And, "the only reason to change from one chemical to another is to avoid new legislation or other government action against existing analogue substances." *Id.* ¶ 67.

In my view, the Government's allegations as to Claimant's *mens rea* are sufficient to survive dismissal. Indeed, a number of the factors discussed above overlap with those recognized as establishing the scienter element in a recent forfeiture case involving proceeds of alleged analogues of JWH-018, including UR-144. *See United States v. Approximately $50,205.00 in U.S. Currency*, 2013 WL 3729573, at *5-6 (E.D. Wis. July 12, 2013) (finding *mens rea* allegations sufficient based on, *inter alia*, sales of product in small, one- and two-gram portions; the "sheer volume of proceeds"; and "supracompetitive pricing" inconsistent with market prices for incense, botanical sachets, and car fresheners).

## 2. The Analogue Act as unconstitutionally vague

Claimant challenges the constitutionality of the Analogue Act as applied to UR-144, AM2201, and MAM-2201. Mot. at 7 (invoking the Fifth Amendment's Due Process Clause). Claimant also seeks an evidentiary hearing on that question. *Id.* at 17-18 ("Request for Evidentiary Hearing"); Reply at 1 ("issues relating to the constitutionality of the Analog Act should be addressed at an evidentiary hearing"). In making that request, Claimant effectively concedes that the constitutional vagueness issue is not appropriate for resolution in connection

with a motion to dismiss. *See, e.g.*, *Approximately $50,205.00 in U.S. Currency*, 2013 WL 3729573, at *7 (in civil forfeiture action, declining to address vagueness challenge requiring consideration of evidence extrinsic to complaint) (citing Supp. R. G(8)(b)(i)).

In *United States v. Klecker*, *supra*, 348 F.3d 69, a criminal case, the defense filed a motion to dismiss the indictment, asserting a constitutional vagueness challenge to the Analogue Act as applied to the substance "Foxy." After two days of testimony, the trial court rejected the challenge. *See id.* at 70.

On appeal, the Fourth Circuit affirmed the lower court's decision that the Analogue Act was not unconstitutionally vague as applied to Foxy. The Court observed that, in assessing whether a statute is unconstitutionally vague, "a court must consider both whether it provides notice to the public and whether it adequately curtails arbitrary enforcement." *Id.* at 71 (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). Regarding arbitrary enforcement, the Court found that concern unavailing, as the Analogue Act's "intent requirement alone tends to defeat any vagueness challenge based on the potential for arbitrary enforcement." 348 F.3d at 71. As for the notice issue, the Court acknowledged that experts may disagree as to the chemical similarity between two substances, but concurred with the overwhelming majority of courts that have upheld the Analogue Act in the face of such vagueness challenges. *See id.* at 71-72 & n.3 (noting that "other courts of appeals have unanimously rejected vagueness challenges to Analogue Act prosecutions" and collecting cases). It also noted that "diagrams admitted into evidence during the hearing on Klecker's motion demonstrate[d] considerable similarities between Foxy" and the banned substance, such that a reasonable person would be on notice that Foxy qualified as an unlawful analogue. *Id.* at 72.

Yet, in connection with the motion to dismiss, the Fourth Circuit cast doubt on the district court's decision to hear evidence with respect to whether the analogue was sufficiently similar to a controlled substance. The Court pointed out that an indictment is not "subject to dismissal on the ground that one of its essential allegations was false." *Id.* at 73.

Although *Klecker* involved a different substance than the three at issue here, the Fourth Circuit's decision suggests that Claimant's vagueness argument provides little in the way of traction. And, as discussed below, further factual development is needed to determine whether the three substances are analogues of JWH-018. *See infra* (concluding that the issue of whether the three substances are analogues cannot be decided at the motion to dismiss stage).

3. Status of substances as analogues

Claimant urges dismissal on the basis that UR-144, AM2201, and MAM-2201 are not analogues of JWH-018. *See* Mot. at 10-13. The Government counters that the question of whether UR-144, AM2201, and MAM-2201 are chemically similar to JWH-018 is a factual dispute, the determination of which is premature. Opp. at 14.

Claimant relies on statements attached as exhibits to its Motion, in which two individuals—a professor of chemistry and chemical biology, and a forensic consultant with prior DEA experience—conclude that UR-144, AM2201, and MAM-2201 are not analogues of JWH-018. *See* Affidavit of Dr. James R. McCarthy, May 10, 2013, Mot. Exh. B (ECF 22-2); Declaration of Joseph P. Bono, July 12, 2013, Mot. Exh. C (ECF 22-3). However, these documents are not "integral to the complaint," and Claimant has not otherwise established why consideration of their contents is appropriate in connection with a motion to dismiss. *See E.I. du Pont de Nemours and Co.*, *supra*, 637 F.3d at 448 (in ruling on motion to dismiss, court must not look beyond the complaint and "documents attached or incorporated into the complaint"); *Brown*

*v. McClure*, 2013 WL 4760970, at \*4 (D. Md. Sept. 3, 2013) (in assessing motion to dismiss, declining to consider affidavit attached to the motion); *Paccar, Inc. v. Elliott Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 690 n.11 (D. Md. 2012) (declining to consider, in connection with motion to dismiss, document that was not integral to the complaint).[14]  In other words, as Claimant's own arguments reflect, the issue of whether the substances are, in fact, analogues of JWH-018 is a question inappropriate for resolution at the motion to dismiss stage.

In *Approximately $50,205.00 in U.S. Currency*, 2013 WL 3729573, at \*7, a district court rejected a claimant's invitation to consider at the motion to dismiss stage evidence as to the chemical structure and similarity in physiological effect of two alleged analogues.  As the court explained, "[s]uch evidence, extrinsic to the complaint, is not a proper subject of a motion to dismiss a civil forfeiture complaint because it challenges the sufficiency of *the evidence* underlying the allegations in the complaint rather than the sufficiency of *the allegations in the complaint themselves*."  *Id.* (emphasis in original).

Similarly, as discussed in *United States v. Klecker*, 348 F.3d at 72, *supra*, the Fourth Circuit said: "Whether a particular substance qualifies as a controlled substance analogue is a question of fact."  *Id.* at 72.  Despite the Court's reservations as to whether an evidentiary hearing was appropriate in connection with a motion to dismiss the indictment, it affirmed the district court's factual finding as to the substance's analogue status, finding that the "record contain[ed] ample evidence supporting [the district court's] conclusions."  *Id.*  In other words, *Klecker* supports the view that a determination whether a substance is an analogue requires

---

[14] Although these cases involve motions to dismiss brought pursuant to the Federal Rules of Civil Procedure, those rules apply with equal force in the context of a civil *in rem* forfeiture action to the extent they are not inconsistent with a Supplemental Rule.  *See* Supp. R. A(2).  Moreover, the Supplemental Rules make clear that a claimant "may move to dismiss the action under Rule 12(b)," Supp. R. G(8)(b)(i), and Claimant invokes Fed. R. Civ. P. 12(b)(6) here.

factual development, and that, at least in the criminal context, a motion to dismiss is not a proper vehicle to dispute a substance's analogue status.

Indeed, numerous courts have also concluded that whether a particular substance constitutes an analogue is a factual question to be decided by the factfinder. *See, e.g.*, *United States v. Reece*, 2013 WL 5234227, at *4 (W.D. La. Sept. 13, 2013) ("Whether AM-2201 actually is a controlled substance analogue is a question of fact that must be assumed as true for purposes of this motion and left to the jury to determine at trial on the merits."); *United States v. Reece*, 2013 WL 3865067 (W. D. La. July 24, 2013) (concluding, in addressing four motions to dismiss brought by other defendants, that "the factual issue of whether AM-2201 is a controlled substance analogue cannot be resolved at this stage of the litigation."); *see also United States v. Bamberg*, 478 F.3d 934, 939 (8th Cir. 2007) ("the jury was required to find [that] 1, 4 BD is a controlled substance analogue"); *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005) ("In its role as factfinder, the district court concluded that the government had proven beyond a reasonable doubt that the chemical structure of 1,4–butanediol is substantially similar to that of GHB and, accordingly, 1,4–butanediol is a controlled substance analogue of GHB."); *United States v. Sullivan*, 2011 WL 3957425, at *2, 3 (D. Neb. Aug. 17, 2011) ("Whether the chemical structures of these substances are 'substantially similar to the chemical structure' of a schedule I or II controlled substance is an issue of fact to be resolved at trial. Similarly, a jury must decide whether [the substances] have, or were represented by the defendant to have, a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to or greater than a schedule I or II controlled substance. Finally, based on the evidence at trial, the jury must decide if Sullivan intended to sell bath salts as drugs for human consumption . . . . The claims for dismissal raised by the defendant present issues of fact. The defendant's motion to

dismiss should be denied."); *United States v. Lusk*, 2005 WL 2704988, at *1 n.1 (D. Alaska Oct. 5, 2005) ("[W]hether the chemical 1,4–Butanediol, if distributed, was in fact a controlled substance analogue as provided in 21 U.S.C. § 802 raises a factual issue for the fact finder at trial."); *United States v. Forbes*, 806 F. Supp. 232, 238 (D. Colo. 1992) ("Of course, whether AET is a controlled substance analogue would ultimately be a question for the trier of fact.").

*The Smoke Shop, LLC v. United States*, 949 F. Supp. 2d 877 (E.D. Wis. 2013), on which Claimant relies, confirms that the issue as to whether a substance qualifies as an analogue is one that requires factual development. To be sure, the district court in that case found that UR-144 and XLR-11 are not analogues of JWH-018. *Id.* at 879.[15] But, it did so only after it "held a hearing where various experts and DEA employees testified regarding whether UR-144 and XLR-11 are controlled substance analogues" and where, following the hearing, "the parties deposed an additional witness and submitted briefs on the issue." *Id.* at 878.

## 4. Particularity

Claimant asserts that the Amended Complaint "fails to establish with sufficient particularity the nexus between Claimant's alleged unlawful conduct and the assets sought to be forfeited." Mot. at 3. It argues that the Adams Declaration "does not properly allege, with any personal knowledge or other evidence, that the cash seized was related to any of the transactions identified in the Agent's Declaration," *id.* at 2, and that "the Government seeks to seize funds in an account belonging to Chelsea Bowles, not M&C Wholesale." *Id.* at 14. In the context of its

---

[15] I pause to point out that several district courts have since declined to follow *The Smoke Shop*. *See United States v. Riley*, 2014 WL 537013 (D. Nev. Feb. 7, 2014) (noting that *The Smoke Shop* "did not cite any journal articles or provide any reasoning for its conclusion" that UR-144 is not an analogue of JWH-018); *United States v. Carlson*, 2013 WL 5125434, at *30 n.33 (D. Minn. Sept. 12, 2013) (stating that *The Smoke Shop* "merely stated, in dicta, that '[t]he decision to schedule UR-144 and XLR-11 suggests that they were not analogues in the first instance'" and adding that *The Smoke Shop* Court "made no holding that UR-144 and XLR-11 are not controlled substance analogues as a matter of law") (quoting *The Smoke Shop*).

particularity argument, Claimant posits a host of other challenges in which, *inter alia*, it insists that the Government must identify the portion of seized funds attributable to each of the three analogue substances and that the Government has adequately traced only a fraction of the more than $2,500,000 it has seized. *See id.* at 13-17.

In response, the Government argues that it "is not required to trace the Defendant Property to the alleged underlying offenses until trial." Opp. at 2; *see id.* at 17-18. At trial, the Government maintains, it will show that "all of the Claimant's business sales involved analogue substances and violated the Analogue Act." Opp. at 2.

In its Reply, Claimant's primary argument is that the Government has not justified any forfeiture in excess of $370,215.50. *See* Reply at 7. That amount is equal to the sum of the seized checks and money orders, which are individually listed in Attachments A, B, and C to the Adams Declaration. *See* ECF 18-1. In Claimant's view, a total of $1,829,784.50, which represents the difference between the $2,200,000 seized and the $370,215.50 itemized in the Attachments, should be returned immediately. Reply at 7-8. Alternatively, Claimant seeks (1) the immediate return of $56,534.22, a sum equal to the balance of Account 0553 on February 28, 2011, the day before JWH-018 became a Schedule I controlled substance; and (2) an order that the Government provide a more definite statement as to why the forfeiture of $2,200,000 should be sustained. *See* Mot. at 2; Reply at 8 & Exh. A (ECF 26-1).[16]

As the Fourth Circuit has explained, a civil forfeiture complaint must "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the

_____

[16] In connection with the request for the immediate return of $56,534.22, Claimant identifies that sum as the balance "in the checking account seized by the government." Reply at 2. However, the bank account seizure at issue occurred from Account 3269; the attached statement reflecting the $56,534.22 balance is for Account 0553. *See* Reply Exh. A (ECF 26-1).

facts and to frame a responsive pleading." *Mondragon*, *supra*, 313 F.3d at 864; *see, e.g.*, *$15,860 in U.S. Currency*, *supra*, 2013 WL 4516138, at *2 ("The government does not have to fully prove its case to meet the pleading requirements, but must only state enough facts for the Court to find a reasonable belief, based on the totality of the circumstances, that the defendant property is linked to narcotic trafficking."); *United States v. 630 Ardmore Drive*, *supra*, 178 F. Supp. 2d at 581 ("[T]he Government's forfeiture claim can advance forward in the face of a . . . motion to dismiss even if the Government's complaint does not provide all the facts that would allow the Government to ultimately succeed in the forfeiture proceeding."); *see also $40,041.20 In U.S. Currency*, *supra*, 2012 WL 5409753, at *5 (inferring based on alleged unlawful conduct by claimant's son and his lack of significant lawful wages that his deposits into bank account were proceeds of illegal drug sales).

In my view, the Government has supplied ample factual allegations in support of the seizure of funds attributable to M&C and Bowles. Indeed, the Government provides detailed allegations regarding Bowles and M&C's involvement in a scheme to manufacture and sell substances alleged to be unlawful analogues. It alleges, *inter alia*, that in April 2012 Bowles told a confidential source that he carried four products: "Brain Freeze," "Black Sabbath," "Game Over," and "Dr. Feelgood." Adams Decl. ¶¶ 28-29. Bowles then shipped samples, all labeled with one of those four names, and which were later found to contain UR-144. *Id.* ¶¶ 30-37. In addition, a courier service employee who had been inside one of Claimant's suites "observed 8-10 individuals seated around a table handling piles of a green herb-like substance. No other activity appeared to be ongoing within the suite." *Id.* ¶ 49. According to the Government, the courier's observations were consistent with the packaging of unlawful analogue substances for retail sale. *See id.* ¶¶ 50-51.

The Government also provides various allegations regarding the scale of M&C's business. M&C allegedly received $66,117.50 from a single retail store, The Tobacco Stop, between November 2010 and December 2011, and, on a single day in July 2011, M&C received deposits totaling $324,522.00. Adams Decl. ¶¶ 77, 79. Moreover, on July 25, 2012, the Government seized, from M&C's Laguna Niguel location, several thousand pounds of the suspected analogue "Spice," of which "Brain Freeze" is one variety; "several kilograms of the suspected pure chemicals that make up the suspected analogue products"; and "several thousand pre-packaged bags of suspected analogue with various brand names that included Brain Freeze, Dr. Feelgood, Black Sabbath, Game Over, and Hysteria[.]" *Id.* ¶¶ 52-57. The Government's allegations are consistent with a large-scale analogue drug production and distribution scheme involving Bowles and M&C.

A number of the arguments Claimant raises in connection with its particularity argument are unpersuasive. For one, Claimant insists that the Government must identify with particularity the amount seized that is attributable to each of the relevant substances: UR-144, AM2201, and MAM-2201. *See* Mot. at 13, 14 ("[W]hile [the Government] can identify the monies proceeded from smoke shops, it has not alleged what specific products resulted in payment of the funds to Claimant. In other words, [the Government] has not alleged what portion of Claimant's property related to the sale of products containing [UR-144, AM2201, and MAM-2201]."), and at 16 ("[The Government] should be required to specifically allege what portion of the funds seized from Claimant's account on July 25, 2012, related to products containing AM-2201, MAM-2201, and UR-144."). No authority is cited in connection with the claim that, at the pleading stage, the Government must allege the proportion of sales attributable to each product.

Moreover, in arguing that the Government must specify the portions of the seizure that pertain to each substance, Claimant misreads the Government's allegations. Claimant's contention is largely premised on its belief that sales of all three analogues remained lawful for at least some period after March 1, 2011. *See* Mot. at 14 ("The distinction is important in that, until May 2013, products containing UR-144 were not illegal.") and at 16 (stating that "AM-2201 became a Schedule I controlled substance on July 7, 2012"; that "MAM-2201 has not been scheduled as a controlled substance"; and reiterating that "UR-144 became a Schedule I controlled substance in May 2013"). Thus, Claimant expressly seeks the "immediate return of all funds in Claimant's account relating to allegations of UR-144 prior to May 2013." Mot. at 16. However, Claimant's argument ignores the Government's allegations that UR-144, AM2201, and MAM-2201, as analogues of JWH-018, all became illegal upon JWH-018's classification as a Schedule I substance on March 1, 2011.

Where the Government has plausibly alleged that the funds seized are derived from the sale of illegal analogues, I see no basis for requiring the Government to further identify, certainly at this stage, specific proportions of sales associated with each substance. *Cf. United States v. Two Parcels of Real Property Located in Russell County, Ala.*, 92 F.3d 1123, 1127 (11th Cir. 1996) ("When probable cause is based on evidence that the participants are generally engaged in the drug business over a period of time, have no other source of income, and that [certain seized] properties were bought with the income produced from that drug business, it is not necessary to identify specific drug transactions in the complaint.") (citing *United States v. Four Parcels*, 941 F.2d 1428, 1440 (11th Cir. 1991)); *United States v. $2,000,000.00 in U.S. Currency*, 906 F. Supp. 2d 1260, 1264 (M.D. Fla. 2012) (citing *Two Parcels*).

In connection with its claim that the Government has traced with particularity only a fraction of M&C's proceeds, Claimant insists that the Government is pursuing a theory "that the checks from the Tobacco Stop totaling $66,117.50 made payable to M&C, somehow taint the entire $2.2 million contained within the accounts of Claimant and Chelsea Bowles." Mot. at 14. Similarly, Claimant asserts elsewhere that the Government has concluded that the seized funds were "tainted" due to a single deposit identified in the Amended Complaint. Reply at 6. *See United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) ("It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account."). However, those arguments mischaracterize the Government's allegations; it plainly is not pursuing a "taint" theory of the sort Claimant portrays.

Turning to the Defendant Property, it is apparent that the Government's allegations are sufficient to state a claim as to the seized checks and money orders. Among other details, the Government has alleged that the purchasers of M&C's products would send it checks or money orders, payable to Bowles or M&C. Adams Decl. ¶ 83; *see also id.* ¶¶ 76-77 (employees of The Tobacco Stop would submit payment to M&C by check). As recounted earlier, the Government supplied allegations as to dates and location of each of the three seizures of checks and money orders. Adams Decl. ¶¶ 52-57 (addressing seizure at M&C's location at 27324 Camino Capistrano, suites 155, 156, and 172, Laguna Niguel, California, on July 25, 2012) and Attachment A (listing checks and money orders seized at that location); *id.* ¶¶ 58-61 (addressing seizure at Bowles's residence, located at 33762 Avenida Calita, San Juan Capistrano, California) and Attachment B (listing checks and money orders seized); *id.* ¶¶ 63-65 (addressing seizures of packages addressed to M&C on July 27, 2012, and August 1, 2012) and Attachment C (listing

checks and money orders seized). Taken together, the Government's allegations sufficiently establish that the seized checks and money orders "were intended to be used to purchase illegal narcotics from Daniel BOWLES and M&C Wholesale and represent proceeds from those sales." Adams Decl. ¶ 86.

However, the Government's averments regarding the seizure from Account 3269 suffer from a glaring omission: the lack of allegations linking that account and the funds within it either to Daniel Bowles or to M&C. The Amended Complaint and the Adams Declaration are completely devoid of information as to the ownership of Account 3269 or the account's signatories. Nor do the allegations establish a connection between funds received by Bowles or M&C and those seized from Account 3269. Indeed, the Government's contention that it has "demonstrate[d] that [Account 3269] was a repository for money paid to purchase illegal narcotics sold by Daniel BOWLES and M&C Wholesale" is conclusory.[17]

Virtually all of the Government's allegations pertain to a separate bank account, Account 0553. *See* Adams Decl. ¶ 77 (stating that bank records dating from November 2010 through December 2011 indicate that "various checks from The Tobacco Stop worth $66,117.50 [and] made payable to M&C Wholesale and/or Daniel Bowles were deposited in Wells Fargo Bank account 0553"); *see also id.* ¶¶ 78-80 (referencing Account 0553 and subsequently describing deposits into "that account"). Paragraphs 76 through 86 of the Adams Declaration follow a

---

[17] Neither party's briefing clarifies the relationship between the two bank accounts, and on several occasions their arguments appear to confuse or conflate the two accounts. In one instance, Claimant refers to the seizure "from target account 2" (a term it does not define); elsewhere, however, it treats allegations apparently pertaining to both accounts as involving only a single account. *See, e.g.*, Reply at 4-5 (chart); *supra* footnote 16. The Government's Opposition exacerbates the uncertainty surrounding the two accounts. In support of the claim that, since March 2011, "well over the $2,200,000 that was seized was deposited into the bank account from which the property was seized," the Government cites paragraph 79 of the Adams Declaration. Opp. at 18 n.11. That allegation concerns deposits totaling $324,522.00 made on July 16, 2011 to Account 0553, and not to Account 3269, from which the seizure of the $2,200,000 occurred. *See* Adams Decl. ¶¶ 78-79.

heading that reads: "Use of Wells Fargo Bank account XXXXXX0553 as a Repository of Illegal Proceeds." *See id.* at 15.

In contrast, the Government's allegations regarding Account 3269 are confined to two paragraphs of the Adams Declaration, which state in full, *see id.* ¶¶ 85-86:

> 85.    On July 26, 2012, pursuant to a seizure warrant issued by the District of Maryland based on a finding of probable cause to believe that the funds in Wells Fargo bank account # XXXXXXX3269 were the proceeds of illegal narcotics distribution in violation of 21 U.S.C. §§ 802(32) and 846, the government seized $2,200,000.00 from that Wells Fargo bank account.[18]

> 85.    The facts above demonstrate that the Wells Fargo bank account # XXXXXXX3269 was a repository for money paid to purchase illegal narcotics sold by Daniel BOWLES and M&C Wholesale.

Unlike the Amended Complaint, the Complaint included allegations concerning the relationship between Account 0553 (referred to as "Target Account 1") *and* Account 3269. *See* ECF 1 at 1, 20.[19] The Government previously alleged in the Complaint, *id.* at 20:

> Also according to subpoenaed Wells Fargo Bank records, immediately prior to July 23, 2012, $2,200,000.00 U.S. was transferred from Target Account 1 to another Wells Fargo Bank account, #7347073269 (Target Account 2); which according to their records is an account that was opened in the name Chelsea BOWLES. As that $2.2M had its genesis in Target Account 1, your affiant submits that there is probable cause to believe that that amount deposited in Target Account 2 is also proceeds of illegal controlled substance analogue sales.

No such allegations appear in the operative Amended Complaint, however. And, "[a]s a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (citation and internal quotation marks omitted); *see First Tennessee Bank Nat. Ass'n v. St. Paul Fire and Marine Ins.*

---

[18] The affidavit in support of the search warrant is not attached to the Amended Complaint.

[19] The relevant allegations are found in the Application and Affidavit for Search and Seizure Warrant of DEA Special Agent Brian Stine, which was attached to and incorporated by reference into the original Complaint. *See* ECF 1 ¶ 9.

*Co.*, 501 F. App'x 255, 257 n.2 (4th Cir. 2012) (citing *Young*); *Buechler v. Your Wine & Spirit Shoppe, Inc.*, 846 F. Supp. 2d 406, 414 (D. Md. 2012) (same).  Nor does the Government refer to the allegations raised in connection with the original Complaint.

Allegations such as those found in the original Complaint, if included in the Amended Complaint, would have been sufficient to establish the basis for a seizure from Account 3269. Nevertheless, the allegations in the Amended Complaint and the attached Adams Declaration plainly fail to allege a connection between M&C's proceeds, including funds deposited into Account 0553, and the $2,200,000 seized from Account 3269.

In sum, the Government has provided sufficient allegations in support of the seizure of the checks and money orders identified in the Amended Complaint.  Nevertheless, because the Government failed to show any connection between Claimant's proceeds and the seizure of $2,200,000 from Account 3269, the Motion is granted.

D.  Leave to amend

The only remaining question is whether to grant the Government's request for leave to amend in the event of any pleading deficiencies.  *See* Opp. at 19.  Under Fed. R. Civ. P. 15(a)(2), "[a] court should freely give leave to amend when justice so requires."  That provision "grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason 'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'"  *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

There is little doubt that leave to amend is appropriate. Discovery has not yet commenced, and Claimant has sought, albeit as alternative relief, a more definite statement as to the Government's allegations. *See* Mot. at 1-2. Nor is this an instance in which amendment would be futile. Rather, it appears that the Government possesses additional information that would resolve the deficiencies identified here. Given these circumstances, I will grant the Government's request for leave to amend.

### III. Conclusion

For the foregoing reasons, Claimant's Motion is granted, with leave to amend. A separate Order follows, consistent with this Memorandum Opinion.

Date:  March 26, 2014                                     _____/s/_____
                                                                            Ellen Lipton Hollander
                                                                            United States District Judge